583 A.2d 1165

COMMONWEALTH of Pennsylvania

v.

**John BOWERS, Appellant.**

Superior Court of Pennsylvania.

Argued May 23, 1990.

Filed Dec. 11, 1990.

378

John R. Carroll, Philadelphia, for appellant.

Karen L. Grigsby, Asst. Dist. Atty., for Com., appellee.

Before WIEAND, McEWEN and HUDOCK, JJ.

WIEAND, Judge:

John Bowers was tried by jury and was found guilty of aggravated assault and carrying a firearm on a public street. Post-trial motions were denied, and Bowers was sentenced to serve consecutive terms of imprisonment for not less than ten (10) years nor more than twenty (20) years for aggravated assault and for not less than two and one-half (2½) years nor more than five (5) years on the firearms offense. On direct appeal from the judgment of sentence, Bowers asserts that the trial court erred by (1) refusing to suppress statements elicited from him by police without prior *Miranda* warnings; (2) denying a defense motion for mistrial based upon disclosure by a Commonwealth witness of inculpatory statements attributed to appellant, which statements had not been provided to the defense during pretrial discovery; and (3) giving erroneous and confusing instructions to the jury regarding the possible verdicts of not guilty by reason of insanity and guilty but mentally ill. Finding no merit in any of these contentions, we affirm the judgment of sentence.

On July 27, 1987, at or about 5:00 p.m., Laureen Marrandino and her boyfriend, Thomas Vargas, were walking along Bainbridge Street in South Philadelphia, engaged in an argument. The two stopped in front of appellant's residence at 416 Bainbridge Street, where the argument continued. When they were told by appellant's two granddaughters to be quiet, a dispute developed between Marrandino and appellant's granddaughter, Natalie. During this secondary verbal dispute, Marrandino kicked the screen door to the Bowers house, and Natalie responded by slamming shut the inner door. Vargas then grabbed Marrandino by the arm, and the two began to walk away. Appellant, however, emerged from his home carrying a shotgun and followed them. When he overtook them, he put the shotgun to Marrandino's abdomen and fired, causing her to suffer serious bodily injuries. Appellant thereafter ran into his house, and Vargas responded in rage by throwing a cinder block through appellant's window.

After being summoned by neighbors, police arrived and began searching for appellant. During the course of their search, they entered appellant's house, where they were unable to find either appellant or the gun which had been used to shoot Marrandino. Appellant was later found hiding on the third floor of an abandoned house located next door to his home. When he saw the police coming, appellant exclaimed that "The mother f__ing Puerto Rican threw a brick through my window. If I was ten years younger, I would have kicked his ass." Appellant also remarked that his wife was dying of cancer. Officer McDevitt helped appellant up, placed him in handcuffs, and asked him several times where the gun was. At first, appellant refused to answer, but eventually he relented and told police that the gun was in the abandoned house. It was thereafter found where appellant had stated.

At trial, appellant presented in defense the testimony of a psychiatrist, who opined that appellant was suffering from grief and depression over the terminal illness of his wife and that, at the time of the shooting, his perception and cognition were adversely affected. The witness opined that because of depression appellant had been unable to perceive the wrongfulness of his shooting of Marrandino. This was so, he said, despite appellant's realization that his conduct was wrongful immediately following the shooting, when appellant hid in the abandoned house. In response, the Commonwealth presented its own expert psychiatric witness who said that, although appellant may have been depressed over his wife's illness, he was generally intelligent and mentally well and was not, at the time of the shooting, laboring under any mental defect or illness. The jury was thereafter instructed on both the insanity defense and the possibility of a verdict of guilty but mentally ill. Both alternatives were rejected by the jury, which found appellant guilty as charged.

Appellant contends that the statements which he made in response to Officer McDevitt's inquiries about the location of the gun should have been suppressed because the in-

quiries were not preceded by *Miranda*[1] warnings. The trial court determined post-trial, however, that appellant's suppression motion had been properly denied because appellant had not been in police custody at the time of the relevant police inquiries and, as such, *Miranda* warnings were unnecessary. In its appellate brief, the Commonwealth does not pursue an argument that appellant was not in police custody, but argues, rather, that appellant's statements were admissible under the holding of the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), which created a public safety exception to the requirements of *Miranda*.

In reviewing the trial court's denial of appellant's suppression motion, we must

> 'determine whether the factual findings of the [suppression] court are supported by the record. In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. If, when so viewed, the evidence supports the factual findings, we are bound by such findings and may only reverse if the legal conclusions drawn therefrom are in error. *Commonwealth v. Trenge*, 305 Pa.Super. 386, 451 A.2d 701 (1982).'

*Commonwealth v. Schneider*, 386 Pa.Super. 202, 206, 562 A.2d 868, 870 (1989), quoting *Commonwealth v. Chamberlain*, 332 Pa.Super. 108, 112, 480 A.2d 1209, 1211 (1984). See also: *Commonwealth v. Kichline*, 468 Pa. 265, 280–281, 361 A.2d 282, 290 (1976); *Commonwealth v. Stark*, 363 Pa.Super. 356, 365, 526 A.2d 383, 388 (1987). We will also affirm the decision of the suppression court "if it can be sustained for any reason whatsoever, even if the lower court offered an erroneous reason to support its action." *Commonwealth v. Reidenbaugh*, 282 Pa.Super. 300, 309–310, 422 A.2d 1126, 1131 (1980). See: *Commonwealth v. Shaw*, 494 Pa. 364, 368 & n. 1, 431 A.2d 897, 899 & n. 1

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(1981); *Commonwealth v. Nelson,* 320 Pa.Super. 488, 493–494, 467 A.2d 638, 641 (1983).

At the suppression hearing, Officer McDevitt described the sequence of events which occurred after appellant had been discovered behind a large drum in the abandoned house. He said:

I just pulled out and pointed my gun and I said "John, I want to see your hands stand up." At which time he didn't make any movement and I screamed, I said "John, stand up."

Q Did he say anything?

A At this time no. He just put his hands up like this. Then he had looked up at me. His head came over the drum.

Q Indicating for the record the officer raised both hands up to about neck level.

A What I could see were his 2 hands and could I see his head over the drum, but I couldn't see the rest of him.

Q Is the person you saw here today?

A Yes. Sitting over there in blue.

MR. FREED: He indicated the defendant John Bowers seated next to counsel.

. . . .

BY MR. FREED:

Q What happened next?

A Well, he brought his hands up and I said "Don't move your hands. I want to see your hands."

I don't know where the weapon is yet.

His hands go up like this. And as I go forward towards him he went like this, back down again.

Q Indicating a falling forward motion.

A Right. Just dropping his arms, because he was behind the drums.

Q What did you do at that time?

A I thought he was going for something and I almost shot the man, which I didn't like, but my hand was going

one way and my body was backing down the steps going another.

I am trying to tell myself don't shoot.

He screamed something to the effect about "I got a bad wheel. I can't get up."

Q What was that?

A "I got a bad wheel. I can't get up." I said "John, I want to see your hands. Let me see your hands."

So somehow he got his hands up again. Officer Pergolini was behind me.

I said, "John, let me see your hands. Don't move."

He started to—he was almost crying, or he was crying. He started saying "Don't beat me. Don't beat me." I am saying, "John, just calm down. Nobody's going to beat you. I want to see your hands."

With that he started to make some other statements to me.

Q What were they?

A He said something to the effect "that Puerto Rican mother fucker. He threw a brick through my window. If I was ten years younger I would have kicked his ass."

And then he was talking—he was crying. He was talking that his wife was dying. She had cancer. She was suppose to die the next day.

Q All right. Where were you when he made these statements about the Puerto Rican?

A I am still in the stairwell. I am trying to get to him. All I want to do is I am trying to get around him so I can see if there is a weapon or something behind these drums.

So I got around to him and I handed Officer Pergolini my gun, because he couldn't get up. I bent down and I didn't want to bend towards him with the gun so I bent down and I tried to help him up.

We got him up, or I got him up. Then once he could stand a little bit, I guess feeling came back in the leg or whatever.

Q Was he handcuffed?

A Not yet. No.

Q At what point was he handcuffed?

A A little after.

I remember he was making some other statements. I don't really recall exactly what all that was said.

Q Anything else that you can recall that he was saying at that time before he was handcuffed?

A (Pause)

Q If you can you can.

A I can't right now.

Q Now, were you able to get him on his feet?

A Yes. I finally got him up.

Q At this point did you know where the weapon was?

A No I didn't.

Q What if anything did you ask him about that?

A I asked him, "John, where is the gun?" He said to me "I can't talk to you, your're [sic] the cops."

I said, "John, I want to know where the gun is. I don't want it laying around for a kid to pick it up. Where is the gun."

He said, "I can't talk to you, your're [sic] the cops."

At this time I tried to cuff him. He's a pretty big guy. His hands are big. When I got his arms behind him to put the cuffs on him the skin actually started to break on his wrists. So I waited for my supervisor to get up there and I said to my supervisor "Can I move the cuffs to the front," because he was visibly limping on the leg. We would have never got him down the stairways with the cuffs behind him.

Q What did you do?

A We put the cuffs in the front so we could direct him down the steps.

Q Did you do that at that time?

A Yes. At that time. That was what we did. He was just upset. He was talking about his wife dying.

Q What was done with the defendant at that time?

A We took him back to our patrol wagon. Myself and my partner.

Q Did you yourself recover a weapon?

A No I didn't. I asked John again I said, "John, where is the weapon? I don't want the weapon laying around. Where is it?"

He said, "Well, your're [sic] the one who arrested me so if you find it you can have the gun, it's an antique."

I said, "I don't want the gun. I want to know where it's at. Is it in the old house or in the new house? Tell me am I hot or cold?"

He said, "It's in the old house," at which time I relayed the information down to the sergeant. I said, "the weapon is in the old house."

Here when we'd gone through the window and went through the back door it was right up against the wall. I didn't even see it. I completely missed it.

Q Was the weapon subsequently recovered?

A Yes.

Q Who recovered it, if you know?

A Officer Long.

Q Did you see a weapon?

A Yes.

Q What did you see?

A It was a shotgun, I think.

Q All right.

At the time the defendant said to you "I can't get up, I have a bad wheel," had you asked him any questions?

A No.

Q At the time he said "that Puerto Rican mother fucker if I was ten years younger I would have kicked his ass," had you asked him any questions?

A No.

Q At the time he told you his wife [was] dying, or words to that effect, had you asked him any questions?

A No. All I said to him is "I want to see your hands."

I wanted to see his hands.

Q At the time he wouldn't tell you where the gun was had you asked him questions about the gun?

A I said "Where is the gun" when I'd gotten him up.

Q Why were you interested in finding the gun?

A I wanted to know where it was. I didn't want him going for it, or somebody else. I wasn't sure exactly what had happened here.

N.T. 10/3/88 at pp. 16–21.

 From this testimony, it cannot plausibly be argued that appellant was not in custody at the time he was asked about the location of the gun. A suspect is subjected to custodial police interrogation when "he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Commonwealth v. Chacko,* 500 Pa. 571, 577, 459 A.2d 311, 314 (1983). See also: *Commonwealth v. Gonzalez,* 519 Pa. 116, 124, 546 A.2d 26, 29 (1988); *Commonwealth v. Toanone,* 381 Pa.Super. 336, 347, 553 A.2d 998, 1003 (1989). Here, upon discovering appellant's hiding place, the police approached him with guns drawn, ordered him to raise his hands above his head, placed him in handcuffs and took him to a patrol wagon. Under these circumstances, appellant was clearly in police custody.

Normally the fact that a suspect is in custody will require that *Miranda* warnings be given to the suspect prior to any police questioning. However, in *New York v. Quarles, supra,* the United States Supreme Court held that in certain situations the requirements of *Miranda* will be excused where police ask questions to ensure the public safety and not to elicit incriminating responses. The facts before the Supreme Court in *Quarles* were that a report had been made to police that a suspected rapist, who reportedly was armed, had fled into a supermarket. Upon apprehending the suspect in the market, the police found that he was wearing a shoulder holster, but did not have a gun in his possession. A police officer asked the suspect where the gun was, and the suspect responded that "the gun is over

there." Both the suspect's statement and the gun were suppressed because of the officer's failure to recite *Miranda* warnings to the suspect prior to inquiring about the location of the gun. On appeal, the United States Supreme Court determined that the police officer's inquiry about the location of the gun was justified by overriding considerations of public safety. Therefore, the suppression order was reversed.

The rationale underlying the creation of the public safety exception to *Miranda* was explained at length by the Supreme Court as follows:

> We hold that on these facts there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.

> Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety. The *Miranda* decision was based in large part on this Court's view that the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissi-

ble practices of police interrogation in the presumptively coercive environment of the station house....

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings

and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

In recognizing a narrow exception to the *Miranda* rule in this case, we acknowledge that to some degree we lessen the desirable clarity of that rule.... But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

The facts of this case clearly demonstrate that distinction and an officer's ability to recognize it. Officer Kraft asked only the question necessary to locate the missing gun before advising respondent of his rights. It was only after securing the loaded revolver and giving the warnings that he continued with investigatory questions about the ownership and place of purchase of the gun. The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.

*New York v. Quarles, supra,* 467 U.S. at 655–659, 104 S.Ct. at 2631–2633, 81 L.Ed.2d at 557–559 (citations and footnotes omitted). See also: *Commonwealth v. Logan,* 519 Pa. 607, 620–621 & n. 3, 549 A.2d 531, 538 & n. 3 (1988).

Instantly, appellant asserts that the public safety exception created in *Quarles* is inapplicable because, at the time Officer McDevitt asked about the location of the gun,

appellant had already been handcuffed and no longer posed a danger. Appellant also asserts that there was no danger to the public because the police could easily have sealed off both his house and the abandoned house next door while they searched for the gun.

We are unpersuaded by appellant's arguments. The suspect in *Quarles* had also been handcuffed at the time of the police inquiry and, presumably, the police in *Quarles* could have evacuated the supermarket while searching for the suspect's gun. In the instant case, the police were aware that appellant had just shot a young woman; and when they arrived at the scene of the shooting, they observed the presence of appellant's two granddaughters and their friend in appellant's house. When the police could not find appellant in his own house, they proceeded to search the abandoned house next door. There they found appellant, but did not find his gun. Under these circumstances, the police, in the interest of public safety, could properly act promptly to ascertain the location of the gun without first informing appellant of his *Miranda* rights. Until found, that gun presented a threat not only to appellant's grandchildren, but also to any other children who unwittingly might have come upon the gun after venturing into the abandoned house. Therefore, appellant's responses to police inquiries regarding the gun's location were not subject to suppression and were properly admitted into evidence at trial.

■ During cross-examination of Officer McDevitt, the defense introduced into evidence a police incident report which had been prepared by McDevitt shortly after the shooting. This report stated in part that the victim "was shot in [the] chest by [appellant] after a cinder block was throne [sic] thru his window by Thomas Vargas...." On redirect examination, Officer McDevitt said that the information in his report had come from appellant. This prompted a defense motion for mistrial on the grounds that such a statement by appellant, detailing the chronology of events, had not been disclosed to the defense via pre-trial discovery. The motion was denied by the trial court. On appeal,

appellant continues to argue that the Commonwealth failed to disclose the existence of a statement by him that he had shot the victim in retaliation for a brick being thrown through his window. He further contends that he was prejudiced by the statement because all other evidence in the case was that the shooting had occurred prior to the brick's being thrown through his window. He argues that proper disclosure of his statement would have altered defense strategy at trial. This argument is circuitous; it is also unavailing. It does not establish a basis for granting a new trial.

Officer McDevitt did not testify that his report had been based on any particular statement by appellant. It appears to have been premised upon appellant's spontaneous remark that "The mother f....ing Puerto Rican threw a brick through my window." This statement, in fact, had been disclosed by the Commonwealth during pre-trial discovery. The Commonwealth suggests, and we agree, that it was from this statement that McDevitt concluded that appellant had shot the victim in retaliation for the brick being thrown through his window. McDevitt further stated on redirect examination that "The only version I heard was what Mr. Bowers said to me, that he had thrown a brick through his window that is why I wrote it that way." Because the substance of appellant's spontaneous remark had been disclosed to the defense in pre-trial discovery—the incident report had also been disclosed—it seems clear that the Commonwealth did not intentionally or unfairly surprise the defense at trial.

A second reason for rejecting appellant's argument is that it was the defense which chose to introduce the incident report and, by doing so, opened the door to a subsequent inquiry by the Commonwealth regarding the source of the information contained therein. Thirdly, both Vargas and another eyewitness testified at trial that the shooting had preceded the brick's being thrown through appellant's window, and the prosecuting attorney argued this sequence of events to the jury in both opening and closing state-

ments. Therefore, it is not likely that McDevitt's testimony on redirect examination had any significant impact upon the outcome of the trial. Appellant admitted the shooting, but claimed to have been legally insane at the time. In our view, whether the brick was thrown through his window before or after the shooting did not adversely impact appellant's insanity defense. As such, there was no basis for the court to declare a mistrial, and the defense motion was properly denied.

■ "In reviewing jury instructions to determine whether reversible error has been committed by a trial court, we consider the charge as a whole. Error will not be predicated on isolated excerpts. Rather, it is the general effect of the charge that controls." *Commonwealth v. Myers,* 376 Pa.Super. 41, 50, 545 A.2d 309, 314 (1988). See also: *Commonwealth v. Ohle,* 503 Pa. 566, 582, 470 A.2d 61, 70 (1983), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986); *Commonwealth v. Riggins,* 374 Pa.Super. 243, 253, 542 A.2d 1004, 1009 (1988). "Even if the court erred when it instructed the jury, we will reverse only if the error prejudiced the appellant." *Commonwealth v. Klinger,* 369 Pa.Super. 526, 540, 535 A.2d 1060, 1066 (1987). See also: *Commonwealth v. Riggins, supra.* Moreover, "[t]he trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Prosdocimo,* 525 Pa. 147, ——, 578 A.2d 1273, 1274 (1990). See also: *Commonwealth v. LaMassa,* 367 Pa.Super. 54, 58, 532 A.2d 450, 452 (1987); *Commonwealth v. Cimorose,* 330 Pa.Super. 1, 10, 478 A.2d 1318, 1323 (1984).

Instantly, the trial court extensively instructed the jury on the defense of legal insanity and on a verdict of guilty but mentally ill. The court's instruction on these concepts, in relevant part, was as follows:

Because the defendant has asserted an insanity defense you'll have to consider four possible verdicts.

In addition to guilty and not guilty, which are available verdicts in any criminal case, you'll have to think about the special alternatives of not guilty by reason of legal insanity, and of guilty but mentally ill.

If you keep in mind why the law permits these two special verdicts it may help you understand my subsequent instructions.

The verdict of not guilty by reason of legal insanity labels a defendant as a sick person rather than a bad person. It signifies that in the eyes of the law that person, because of mental abnormality at the time of the crime, does not deserve to be blamed and treated as a criminal for what he did.

The verdict of guilty but mentally ill labels a defendant as both bad and sick. It means that in the law's eyes that person at the time of the crime was not so mentally abnormal as to be relieved from blame and criminal punishment for what he did, but that he was abnormal enough to make a prime candidate for special therapeutic treatment.

Legal insanity which exists at the time of an alleged crime is a complete defense to that crime. The defendant has the burden of proving an insanity defense by a preponderance of the evidence as explained to you earlier. That is by greater weight of the evidence.

If the defense is proven the defendant is entitled to a verdict of not guilty by reason of legal insanity.

. . . .

The term "insanity" has a special meaning in the criminal law.

A person whom medical experts would diagnose as mentally disordered or whom a layman would call crazy may not be insane when judged by the legal test.

The test or the definition of legal insanity is this:

A person is legally insane if at the time of committing an alleged crime he is laboring under such a defect of reason from disease of the mind as not to know the

nature and quali[t]y of the act he is doing, or, if he does know the nature and quality of the act he does not know that what he is doing is wrong.

Stated more simply, a person is legally insane if at the time of committing an alleged crime he is, as a result of mental disease or defect, either incapable of knowing what he is doing, or if he does know what he is doing, is incapable of judging that it is wrong.

. . . .

The term "mental disease or defect" in this test means a disease or infirmity of the mind as distinguished from a mere fault of character, temperament or social adjustment.

. . . .

Guilty but mentally ill becomes a possible verdict when a defendant offers but fails to prove a legal insanity defense.

A jury may return such a verdict when it finds beyond a reasonable doubt that the defendant committed the crime alleged and that the defendant, although the jury did not find him legally insane, was mentally ill at the time of the crime.

The term "mentally ill" is another term with a special meaning.

The definition or test of mental illness for our purposes is this:

A person is mentally ill if he at the time of an alleged crime and as a result of mental disease or defect lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

Comparing the definitions of legal insanity and mental illness, we can see that they both require a mental disease or defect which is something more than faulty character, temperament or social adjustment.

Their definitions differ, however, with regard to the incapacitating effect necessary for legal insanity on the one hand or mental illness on the other.

Legal insanity requires that the defendant be incapable of knowing what he is doing or judging its wrongfulness.

Mental illness requires only that the defendant lack substantial capacity either to appreciate the wrongfulness of what he was doing, or to obey the law.

Loosely speaking, mental illness is the broader term. It covers a greater range of abnormal conditions than legal insanity.

A final difference lies in the degree of proof.

Legal insanity must be proven by a preponderance of the evidence, while mental illness must be proven beyond a reasonable doubt.

. . . .

To sum up. You have four alternative verdicts to think about. Two are the ordinary verdicts of guilty and not guilty. The other two are the special verdicts of not guilty by reason of legal insanity, and guilty but mentally ill.

In order to find the defendant not guilty by reason of legal insanity you must be satisfied by a preponderance of the evidence first that at the time of the killing John Bowers the defendant had a mental disease or defect.

And, second, that as a result of that disease or defect was either incapable of knowing what he was doing, or if he did know what he was doing, was incapable of judging that it was wrong.

In order to find the defendant guilty but mentally ill you must be satisfied beyond a reasonable doubt, first, that the defendant committed the alleged crime.

Second, that although you did not find him legally insane, the defendant at the time of the crime had a mental disease or a defect.

And, third, that as a result of that disease or defect the defendant lacked substantial capacity either to appreciate

the wrongfulness of his conduct, or to conform his conduct to the requirements of the law.

After careful review, we conclude that the court's instructions accurately reflected the statutory definition of legal insanity, 18 Pa.C.S. § 315, and the law pertaining to a verdict of guilty but mentally ill, 18 Pa.C.S. § 314. The trial court went to great lengths to explain these concepts in clear and concise language and to inform the jury concerning the subtle distinctions which separated a verdict of not guilty by reason of insanity and a verdict of guilty but mentally ill. In *Commonwealth v. Trill*, 374 Pa.Super. 549, 543 A.2d 1106 (1988), the Superior Court rejected an argument that the statutory definitions of "mental illness" and "legal insanity" were so vague and confusing as to violate due process. Judge Beck, while writing in concurrence, said the following, which we here adopt.

I agree that the statutory definitions of "mentally ill" and "legally insane" are somewhat similar. Both include a person whose understanding of the wrongfulness of his conduct is impaired. Closer examination, however, yields the conclusion that the two definitions refer to differing degrees of impaired understanding. They are therefore sufficiently different to withstand attack on the ground that the jury cannot make a principled application of the statutory definitions.

"Mentally ill" and "legally insane," while both referring to conditions of mental disturbance, describe two distinct points along the continuum of mental conditions.

. . . .

The difference between mental illness and legal insanity with regard to comprehension of the wrongfulness of one's conduct is a matter of the degree of one's impairment. The mentally ill defendant in a murder case may exhibit only a limited understanding that killing is generally agreed to be wrong; the legally insane person has no idea whatsoever that killing is considered to be wrong. I find this distinction to be sufficient to permit a jury to

differentiate between mental illness and legal insanity, and therefore would uphold the constitutionality of the guilty but mentally ill verdict.

*Id.*, 374 Pa.Superior Ct. at 600–601, 543 A.2d at 1131. The trial court's instructions in the instant case fully and accurately apprised the jury of the difference between a verdict of not guilty by reason of insanity and guilty but mentally ill. There was no error.

The judgment of sentence is affirmed.

McEWEN, J., did not participate in the consideration of or decision of this appeal.