J-S79010-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WYDELL M. BRONSON | : | |
| | : | |
| Appellant | : | No. 1226 EDA 2017 |

Appeal from the Judgment of Sentence February 21, 2017
In the Court of Common Pleas of Delaware County
Criminal Division at No(s):  CP-23-CR-0007168-2015

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 06, 2018**

Wydell M. Bronson appeals from the judgment of sentence imposed on February 21, 2017, in the Court of Common Pleas of Delaware County following his conviction by a jury on charges of aggravated assault (two counts), conspiracy to commit aggravated assault, and possession of an instrument of crime.[1]  Bronson received an aggregate sentence of 14-28 years' incarceration.  In this timely appeal, Bronson raises four issues.  He claims: (1) there was insufficient evidence to support his convictions, (2) the convictions were against the weight of the evidence, (3) the trial court erred in granting the Commonwealth's motion *in limine* forbidding the use of *crimen falsi* convictions to impeach certain Commonwealth witnesses, and (4) the trial

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 903, and 907(a), respectively.

court erred in failing to suppress a statement Bronson gave to the police without having been read his *Miranda*[2] rights. Although we agree with Bronson regarding the last issue, we find harmless error and affirm the judgment of sentence.

The history of this incident is as follows. In September, 2015, Randi Jackson, Wayne Carrington and Matt Jeffries[3] were at the Waterford Inn, a bar/restaurant located in Upper Darby, Pennsylvania. While they were there, Bronson, co-defendant Christopher Lugowski[4] and Shatanya Miller also entered the bar. At closing time, approximately 2:00 a.m., Miller and Jackson got into an altercation during which the two women traded punches and eventually rolled down a steep incline just outside the bar. At some point, Lugowski allegedly punched Jackson as well. The women were separated and the parties went their respective ways prior to the arrival or involvement of the police.[5]

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct 1602, 16 L.Ed.2d 694 (1966).

[3] Mr. Jeffries was also referred to by his stage name, Matt Black.

[4] Prior to trial, Lugowski pleaded guilty to charges related to this crime. *See* Trial Court Opinion, 7/18/2017 at 1, n.1. His statement to the police and text messages between his phone and Bronson's were excluded from Bronson's trial. The substance of the statement and text messages are not part of this certified record and play no part in our resolution of this matter.

[5] There was testimony that sirens were heard approaching the scene, but as the participants left the scene, it is not clear if those sirens had anything to do with the fight or were in response to an unrelated incident. *See* N.T. Trial, 12/13/2016 at 99.

Approximately one month later, on October 16, 2015, both groups of people once again found themselves at the Waterford Inn. The groups were sitting at opposite ends of the bar. Miller blew kisses toward Jackson a number of times. Near closing time, Miller went to the rest room while Lugowski waited outside for her. Carrington followed and told Lugowski he did not appreciate how Lugowski had hit Jackson in the prior altercation. Lugowski attempted to hit Carrington. Carrington struck Lugowski, knocking him to the ground. Bronson, Miller and Lugowski then left the scene in a white four-door sedan; the same vehicle they had been seen in at the prior incident.

Carrington, Jeffries and Jackson all stayed at the Waterford Inn to help the bartender, a friend of theirs, close up. At approximately 4:00 a.m., Jeffries held open one of the doors to allow Carrington to exit and take out some trash. At that time, from behind some bushes across the street, several shots were fired, Carrington was struck in the leg, and one of the bullets went into the door and struck Jackson, who was sitting down, in the abdomen. Jeffries fell to the ground and was not shot. He did, however, see a figure he identified as Bronson leave the area of the bushes where the shots had come from, and get into the same white car that had taken Miller, Bronson, and Lugowski away earlier that morning. Carrington identified Lugowski as the driver of the car.

At approximately 7:00 p.m. that day, more than 15 hours after the shooting, the police arrested Bronson at his place of employment, a

restaurant.[6]  The police also seized Bronson's cell phone, which was in the office, charging.  Investigating the scene of the crime, the police found bullet fragments and spent .223 caliber shell casings, some of which were found in the bushes across the street from the Waterford Inn.  The .223 caliber casings are associated with assault weapons.[7] Approximately 30 to 45 minutes after Bronson was taken to the police station, Detective Thomas Thompson asked Bronson where the gun was.  Detective Thompson testified at the suppression hearing held immediately prior to trial, that Bronson said he would call his father to have the gun brought in.  Bronson had not, at any time prior to this limited questioning, been read his ***Miranda*** rights.  The gun was never located.

Relevant to this appeal, the Commonwealth filed a motion *in limine* seeking to prevent Bronson from impeaching Carrington, Jeffries and Jackson with prior convictions.  Bronson filed a motion to suppress the statement given

---

[6] Police also interviewed other patrons of the Waterford Inn who indicated they had witnessed an altercation between the victims and a group of people wearing clothing from the same restaurant Bronson worked at.  Both Lugowski and Jackson also worked at that restaurant.  ***See*** N.T. Trial, 12/15/2016 at 11.

[7] The police also located two spent 5.56 mm NATO cartridges.  5.56 millimeters converts to approximately .218 inches, making them similar to the .223 caliber cartridges found. Both calibers of ammunition can be fired from either caliber of weapon, although it is not recommended to fire 5.56 mm ammunition from a .223 caliber weapon.  ***See*** N.T. Trial, 12/14/2016 at 79-80.

to the police regarding the phone call to his father and the gun. The trial court granted the Commonwealth's motion *in limine* and denied Bronson's motion to suppress.

Before we engage in a substantive analysis of the issues, we first note that Bronson's challenges to the sufficiency and weight of the evidence have not been properly preserved. The challenge to the sufficiency of the evidence was not included in Bronson's Pa.R.A.P. 1925(b) statement, thereby waiving that issue.[8] Additionally, Bronson did not challenge the weight of the evidence in either a pre-sentence motion or written post-sentence motion as required by Pa.R.Crim.P. 607(A)(1)-(3).[9] Therefore, we will not address either of those claims.

The first substantive issue we will address is Bronson's claim that the trial court erred in granting the Commonwealth's motion *in limine* regarding the prior convictions of the Commonwealth's main witnesses.

Our standard of review is as follows.

> The determination of the scope and limits of cross-examination are within the discretion of the trial court, and we cannot reverse those findings absent a clear abuse of discretion or an error of law. ***Commonwealth v. Nolen***, 535 Pa. 77, 82, 634 A.2d 192,

---

[8] ***See Commonwealth v. Castillo***, 888 A.2d 775, 780 (Pa. 2005) (superseded by Rule on other grounds) (any issues not raised in Pa.R.A.P. 1925(b) statement will be deemed waived).

[9] ***See Commonwealth v. Kinney***, 157 A.3d 968, 972 (Pa. Super. 2017) (pursuant to Pa.R.Crim.P. 607, a challenge to the weight of the evidence must be raised with the trial judge or it will be waived).

> 195 (1993). Evidence of prior convictions may be introduced for the purpose of impeaching the credibility of a witness if
>
>> the conviction was for an offense involving dishonesty or false statement, and the date of conviction or the last day of confinement is within ten years of the trial date. If a period of greater than ten years has expired the presiding judge must determine whether the value of the evidence substantially outweighs its prejudicial effect.
>
> *Commonwealth v. Randall*, 515 Pa. 410, 415, 528 A.2d 1326, 1329 (1987).

*Commonwealth v. Brown*, 673 A.2d 975, 978 (Pa. Super. 1996).[10]

Each of the Commonwealth's witnesses in question, Carrington, Jeffries and Jackson, had prior convictions. It is the burden of the party seeking to introduce the crimes to demonstrate the crimes at issue represent *crimen falsi*. *See Commonwealth v. Davis*, 17 A.3d 390, 396 (Pa. Super. 2011).

Carrington pled guilty to simple assault and possession of a controlled substance in 2010. While these conviction were clearly within the ten year limit, neither of these crimes represent *crimen falsi*. Accordingly, we find no error in excluding impeachment of Carrington based on these convictions.

In 1990, Jeffries pled guilty to forgery and was convicted of third degree murder. In 2005, he was convicted of failing to provide identification to police in Virginia. Third degree murder is not *crimen falsi*. The trial court noted that Bronson failed to demonstrate that the Virginia crime represented *crimen falsi* and did not provide the court with the elements of that crime, making analysis of the crime impossible. Forgery is clearly *crimen falsi*. However, Jeffries'

---

[10] *See also* Pa.R.E. 609.

conviction for that crime was more than 25 years before the date of the instant trial. In denying Bronson the use of this crime, the trial court noted that the crime was not repeated and there was no demonstration of record indicating such dishonesty was a habit with Jeffries. Accordingly, we find no error in the trial court excluding these crimes from use as impeachment.

Finally, Jackson was convicted of retail theft, a *crimen falsi*, in 1998. This conviction was 18 years prior to trial. As with Jeffries' conviction for forgery, the trial court reasoned that, given the gap between conviction and the instant trial, and the fact that there was no evidence of record indicting a habit of dishonesty, the conviction was irrelevant for impeachment purposes. Once again, we find no error in that determination.

In light of the foregoing, Bronson is not entitled to relief on this issue.

In his final issue, Bronson argues the trial court erred in failing to suppress the non-***Mirandized*** statement given to the police regarding the possible location of the gun.

Our standard of review for the denial of a motion to suppress evidence is well settled.

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those]

> findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.
>
> *Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation omitted).
> Additionally, the Pennsylvania Supreme Court has ruled that when reviewing a motion to suppress evidence, we may not look beyond the suppression record. *See In re L.J.*, 622 Pa. 126, 79 A.3d 1073 (2013).

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017).

The shooting in this matter took place at approximately 4:00 a.m. The caliber of shell casings found at the scene indicated an assault rifle type weapon had been used. Approximately 18 hours later, at 8:00 p.m., which is also approximately ½ to ¾ of an hour after being taken into custody, Detective Thompson interviewed Bronson without first providing Bronson with his *Miranda* rights. Detective Thompson testified that the sole subject of the interview was the location of the weapon. Both the Commonwealth and the trial court assert that this questioning was allowable under the public safety doctrine, which permits a limited inquiry of a suspect, without *Miranda* warnings, in order to prevent an immediate harm.

Both the Commonwealth and the trial court cite *New York v. Quarles*, 104 S.Ct. 2626 (1984) and *Commonwealth v. Bowers*, 583 A.2d 1165 (Pa. Super. 1990) in support of their analysis. The Commonwealth additionally relies upon *Commonwealth v. Sepulveda*, 885 A.2d 783 (Pa. Super. 2004)

and *Commonwealth v. Stewart*, 740 A.2d 712 (Pa. Super. 1999). Our review of the certified record and case law leads us to conclude this analysis and reliance are in error.

The public safety exception is a narrowly tailored exception to the requirement that before a person is subjected to a custodial interrogation, that person must be informed of his or her *Miranda* rights. The public safety exception was announced in *Quarles*, *supra*. The United States Supreme Court, in a divided decision,[11] held that under limited circumstances, *Miranda* warnings were not required. In *Quarels*, a rape suspect fled into a nearby supermarket immediately following the crime. The victim also informed the police officers that the suspect was carrying a gun. Officers entered the supermarket and located the suspect, who attempted to flee. Officers briefly lost sight of him. When he was located, he was apprehended and frisked. The police found an empty shoulder holster. One of the officers asked Quarles where the gun was and he nodded his head toward some boxes and replied "the gun is over there." *Id*. 104 S.Ct. at 2627. In explaining the public safety exception, the majority stated:

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the

---

[11] Justice Rehnquist delivered the majority opinion. Justice O'Connor, concurred in part and dissented in part. She disagreed with the creation of the public safety exception, but would not have suppressed the non-testimonial evidence derived from the interrogation. Justices Marshall, Brennan and Stevens dissented.

suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

*New York v. Quarles*, 104 S.Ct. at 2632.

Justice Rehnquist further reasoned,

We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warning in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id.*

A central aspect of this reasoning is the immediate nature of the situation, one in which a police officer has limited time, perhaps seconds, to determine a course of action and attempt to retrieve some instrument, usually

a weapon, that may place the public in jeopardy. The necessity of exigency of the situation is demonstrated in all of the cases cited by both the trial court and the Commonwealth.

In *Commonwealth v. Bowers*, *supra*, Bowers used a shotgun to seriously injure a neighbor. He then fled into his home. By the time the police arrived, only a short time later, Bowers had fled to a next door abandoned home, where he was found hiding on the third floor. However, the shotgun was not immediately located. After apprehension, Bowers was asked where the gun was and after being asked several times, told the police where he had hidden the weapon. A panel of our Court reasoned,

> In the instant case, the police were aware that appellant had just shot a young woman; and when they arrived at the scene of the shooting, they observed the presence of appellant's two granddaughters and their friend in appellant's house. When the police could not find appellant in his own house, they proceeded to search the abandoned house next door. There they found appellant, but did not find his gun. Under these circumstances, the police, in the interest of public safety, could properly act promptly to ascertain the location of the gun without first informing appellant of his *Miranda* rights. Until found, that gun presented a threat not only to appellant's grandchildren, but also to any other children who unwittingly might have come upon the gun after venturing into the abandoned house. Therefore, appellant's responses to police inquiries regarding the gun's location were not subject to suppression and were properly admitted into evidence at trial.

*Id.* at 1171-72.

In *Commonwealth v. Sepulvada*, *supra*, the police were called to a scene where witnesses had viewed an assault and gunshots had been heard. The police believed they were investigating a situation of domestic violence.

When they arrived, they saw blood on the porch of the house and damaged property. When they arrested the suspect, believing a woman had been injured in the assault, and, given the physical evidence, believing she would likely be in need of medical attention, asked Sepulveda where the woman was. He responded there was no woman, he had killed them and they were in the basement. The statement led the police to find multiple murder victims in the basement. The specific reasoning of the Pennsylvania Supreme Court in allowing the introduction of the statement is remarkably similar to that of *Quarles* and *Bowers*.

> However, we also agree with the trial court that overriding considerations of public safety justified Trooper Tretter's failure to provide Appellant with *Miranda* warnings before asking him the limited question regarding the woman's whereabouts while Appellant was in the patrol car. Based on the call from Appellant's neighbor, Trooper Tretter and Trooper Rutter believed that they were responding to a violent domestic dispute. When they arrived at the scene, the troopers not only observed damaged property, but also saw blood on the neighbor's front door, on a jacket left in the yard, and on the door of Appellant's residence. The troopers then received a confusing account of events from Appellant. Given these circumstances, the troopers could not be certain of the extent of danger before them nor could they be sure of the safety of the alleged woman involved in the reported domestic violence incident. In addition, once Appellant was placed in the patrol car, Trooper Tretter asked Appellant a very focused question, aimed at discovering the whereabouts of the alleged woman. Based on these circumstances, we conclude that the troopers were not attempting to elicit an incriminating response from Appellant when they placed him in the patrol car and asked him about the woman's location, but rather, were motivated solely by a concern for their own safety and the safety of the alleged woman. *See Quarles*, 467 U.S. at 657, 104 S.Ct. 2626 (concluding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-

- 12 -

incrimination"); *see also **Commonwealth v. Bowers***, 400 Pa.Super. 377, 583 A.2d 1165, 1171 (1990) (recognizing the reasoning in ***Quarles***). Accordingly, Appellant's statements to Trooper Tretter were admissible under the public safety exception and thus were properly admitted by the trial court. ***See Quarles***, 467 U.S. at 655-57, 104 S.Ct. 2626; ***Stewart***, 740 A.2d at 719-20.

***Id.*** at 790-91.

Finally, ***Commonwealth v. Stewart***, ***supra***, is not directly on point. ***Stewart*** did not involve non-***Miranda*** questioning. Rather, it involved a warrantless search of an automobile for handguns – specifically, opening the car door and looking under a floor mat - immediately following a shooting.

All the cases invoking public safety as an exception to either ***Miranda*** or obtaining a warrant, took place immediately following the crime in question, at or near the crime scene, in a situation where the danger to others was manifestly apparent, and the police officers in question had little time to weigh their options.

Instantly, a missing weapon, used in a shooting, is undoubtedly a possible danger to others. This is an unfortunately common scenario. However, unlike the situations presented in the case law, there was an 18-hour gap between the crime and the questioning. The United States Supreme Court spoke of the *seconds* allowed the police officer to determine his or her course of action, not hours and certainly not three-quarters of a day. There was no evidence that the gun, believed to be an assault rifle, had been disposed of anywhere near children or other civilians as in ***Quarles*** or

*Bowers*. There was no indication that an undiscovered person was in need of immediate medical attention as in *Sepulveda*. We do not believe that the all too common fact, by itself, of a missing weapon, 18 hours after the crime, represents the exigency described in *Quarles*. We are unwilling to extend the public safety exception to the requirement of providing *Miranda* warnings to the questioning of a person in custody in the instant factual situation. If we did so, we would essentially be ruling that a missing weapon alone, provides the authorities with the ability to question a suspect without *Miranda* warnings, no matter how attenuated the crime itself. Accordingly, we find the trial court erred in failing to suppress Bronson's statement made in response to Detective Thompson's questions regarding the location of the weapon.

However, while the trial court erred, we believe that error did not prejudice Bronson to the point of requiring a new trial. The statement, although incriminating by inference, was not a confession. The evidence presented at trial, a mixture of direct and circumstantial evidence, provided a sufficient foundation for conviction. One eyewitness positively identified Bronson as the person he saw leaving the bushes across the street from the Waterford Inn and getting into the car that was driven by the person who was with him at the bar. The car was seen on CCTV at the scene, at the time of the shooting. Cell phone records placed Bronson in the area of the shooting at the time of the shooting and placed him leaving the area immediately following the shooting. Bronson admitted to being at the bar on both nights

in question and admitted there had been altercations between the parties. Bronson testified that he could not explain why his cell phone records would place him at the scene of the crime, stating only that he was vague about what happened with his phone. The eyewitness testimony combined with the strong circumstantial evidence and Bronson's testimony provide a sufficient basis for conviction. Accordingly, the error in allowing Bronson's non-***Mirandized*** statement was harmless.

In light of the foregoing, Bronson is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/6/18</u>