**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**John E. duPONT, Appellant.**

Superior Court of Pennsylvania.

Argued March 9, 1999.

Filed April 20, 1999.

Reargument Denied June 29, 1999.

---

Vincent J. Grogan, Pittsburgh, for appellant.

Alan Dershowitz, Cambridge, MA, for appellant, pro hac vice.

Laurie Magid, Asst. Dist. Atty., Media, for Com., appellee.

Before KELLY, LALLY–GREEN and BROSKY, JJ.

BROSKY, J.

¶ 1 John E. duPont appeals from judgment of sentence imposed after a jury found him guilty, but mentally ill, of third degree murder [1] and simple assault.[2] For the reasons which follow, we affirm the judgment of sentence.

¶ 2 Prior to his arrest in January 1996, appellant resided on an 800–acre estate known as "Foxcatcher Farm" located in Delaware County. For many years appellant operated a wrestling training facility on the premises, and provided housing on the estate to some of the wrestlers who trained at his facility and were members of "Team Foxcatcher," a wrestling team founded by appellant.

¶ 3 People who knew appellant noticed a change in his behavior and emotional state around the time of his mother's death in 1988. Appellant became extremely security conscious, and hired a security firm in 1993 to provide protection on the estate. Despite the firm's efforts implementing extensive security measures, appellant exhibited paranoid fear on several occasions that he was being spied upon and that his life was in danger.[3] Several witnesses also

1. Third degree murder is set forth at 18 Pa. C.S. § 2502(c); provision for a finding of Guilty but mentally ill is set forth at 18 Pa. C.S. § 314.

2. 18 Pa.C.S. § 2701.

3. During 1993, for example, appellant installed razor wire in the walls of his home to prevent persons from hiding within the walls; he also had excavators dig on his property to search for underground tunnels he believed to lead to his home.

related incidents of appellant's drug and alcohol abuse between 1988 and 1995. In spite of his unusual behavior, however, appellant continued to manage his facility and maintain the daily operations.

¶ 4 Over time appellant developed close relationships with some of the wrestlers at his facility, and came to dislike others. He began to exhibit animosity toward David Schultz, a successful wrestler and also one of the facility's wrestling coaches, sometime in 1995. On the afternoon of January 26, 1996, appellant went to the residence of Mr. Schultz accompanied by one of the estate security consultants, Patrick Goodale. Mr. Schultz was working on his car, but greeted appellant on his arrival. Appellant asked Mr. Schultz, "You got a problem with me?" and shot him three times with a .44 Magnum revolver. He also pointed the weapon at Mr. Goodale and toward Mr. Schultz' wife who was in the house. Appellant then fled in his vehicle to his mansion, reloaded and locked up his weapon, and refused to surrender to police. During the two day standoff which followed, appellant spoke with his attorney on numerous occasions. He was finally apprehended on January 28, 1996 when he left the mansion to attempt a repair of the heating system.

¶ 5 On February 9, 1996 the trial court ordered a competency examination, which was completed on September 9, 1996.[4] Following a hearing on appellant's competency, the trial court determined appellant to be incompetent to proceed to trial[5] by order of September 24, 1996. He was remanded to the Norristown State Hospital for treatment. A second competency hearing was held in December 1996, and the trial court determined that appellant was then competent to proceed to trial, which began in January 1997.

¶ 6 At trial, appellant did not dispute that he shot Mr. Schultz, but put forth a defense of insanity. Following the guilty but mentally ill verdicts, he was sentenced on May 13, 1997 to a term of imprisonment of thirteen to thirty years on the murder conviction and a concurrent term of three to six months on the assault conviction; an order for costs was also imposed. Post trial motions were denied by the trial court on October 17, 1997 and this appeal followed.

¶ 7 Appellant raises the following issues for our review:

I. The trial court erred in permitting the Commonwealth's psychiatric expert to testify in violation of both the psychiatrist-client and attorney-client privileges, where the witness previously was consulted about duPont's mental condition;

II. Pennsylvania's statutory framework for not guilty by reason of insanity and guilty but mentally ill determinations was not followed in this case; those laws – as they were applied – violate the due process, equal protection, and cruel and unusual punishment provisions of the constitution;

III. The trial court erred in allowing the Commonwealth to admit evidence of duPont's alleged prior bad acts;

IV. duPont is entitled to a new trial because hearsay was admitted in violation of the expert testimony rule and duPont's constitutional right of confrontation;

V. The court below erred in permitting the prosecutor to argue that the jury could draw an inference against the defendant because the defense had presented only portions of a videotaped interview and in instructing the jury that such an inference would be proper;

---

4. In the interim, our Supreme Court had entered a stay of all competency proceedings, which was removed on August 19, 1996.

5. 50 P.S. §§ 7101 *et seq.*

VI. duPont was prejudiced by the use of a misleading verdict sheet containing written jury instructions;

VII. The sentence should be vacated as unreasonable and because the bill of costs is excessive.

## I. The Commonwealth's Psychiatric Expert Witness

¶ 8 We first address appellant's contention that the trial court erred in permitting the Commonwealth to present testimony of Dr. John O'Brien as a psychiatric expert on appellant's mental condition. The trial court had originally appointed Dr. O'Brien in March 1996 as one of two physicians to examine appellant in connection with his competency to stand trial. Defense counsel objected to his appointment but the reasons therefor do not appear on the record. The trial court did, however, vacate Dr. O'Brien's appointment based on the objection, and replaced him with a different doctor.

¶ 9 At the September 1996 competency hearing, Dr. O'Brien was called to testify as an expert witness for the Commonwealth. The defense again objected and made an oral motion to disqualify him as a witness, this time referring to some past relationship between Dr. O'Brien and appellant. The trial court heard argument by counsel, summarized on the record the limited previous connection between Dr. O'Brien and appellant,[6] and denied the motion to disqualify. As stated above, the trial court found appellant was not competent in September 1996 to proceed to trial, but after treatment the court did determine he was competent in a subsequent hearing in December 1996.

¶ 10 In his defense, appellant presented extensive evidence that he suffered from mental illness, specifically paranoid schizophrenia. This evidence included his delusional beliefs, particularly during the standoff and in examinations after the shooting, that he was Jesus Christ, the Dalai Lama, and a Russian czar, among others. Appellant's expert witnesses opined that he was insane at the time he shot Mr. Schultz.

¶ 11 On rebuttal, the Commonwealth called Dr. O'Brien to testify as one of their expert psychiatric witnesses, and the trial court reiterated on the record that the defense motion to disqualify him from testifying was denied. No written form of this motion nor any accompanying supporting documents were ever filed of record.[7] Dr. O'Brien testified that, in his opinion, appellant did suffer from mental illness but was not insane at the time Mr. Schultz was shot. The Commonwealth's

6. The trial court stated that Dr. O'Brien had contacted the court when his appointment was vacated, in an effort to explain his limited prior connection to appellant and to assure the court that he did not intend to conceal this information. The court summarized this contact as follows:

THE COURT: [Dr. O'Brien] never opened a file on Mr. duPont. He had never met Mr. duPont, that his only information regarding Mr. duPont was obtained by him when certain individuals consulted a physician at the institute regarding Mr. duPont and his behaviors, and that physician, in turn called in a number of other physicians to the conference, essentially to solicit their opinion. And Dr. O'Brien voiced certain opinions with regard to the reports of the conduct that he had received and what could or could not be done legally as a result of that conduct and left the room.

Is that a correct statement of the limit of Dr. O'Brien's contact with Mr. duPont?
MR. WOCHOK [Counsel for defendant]: Except for the fact I believe he also signed onto the report that was prepared as a result of that meeting and was, in fact, paid by me when he submitted his bill.
N.T. 9/21/96, pp. 675–76.

7. Appellant has included a copy of a Motion to Disqualify Dr. O'Brien in his Reproduced Record. However, the law is clear that this court may only review and consider matters which have been filed as part of the certified record. *Commonwealth v. Gonzalez*, 415 Pa.Super. 65, 608 A.2d 528 (1992); Pa.R.A.P. 1921. Nevertheless, there is sufficient evidence of record to enable us to address the merits of this argument.

other expert, Dr. Park Dietz, provided a similar opinion.

¶ 12 Appellant contends on appeal that the trial court erred when it permitted the Commonwealth to present Dr. O'Brien's testimony in light of his previous connection to appellant. He argues that both the psychiatrist-patient privilege, 42 Pa.C.S. § 5944, and the attorney-client privilege, 42 Pa.C.S. § 5916, have been violated by admission of this testimony.

¶ 13 Dr. O'Brien testified that four years earlier, in December 1992, he had attended a conference with two other psychiatrists and Mr. Wochok, an attorney for appellant. Dr. O'Brien, who was often involved with involuntary civil commitment of persons, was present at the request of one of the other physicians. The conference lasted approximately one hour, and Dr. O'Brien recalled only that they discussed possible means of obtaining a psychiatric evaluation of Mr. duPont, that duPont probably used cocaine, and that duPont had once fired a weapon inside his home.

¶ 14 Dr. O'Brien never met, spoke with, or saw Mr. duPont, did no evaluation or treatment of him, and did not even know appellant was the same duPont who had been the subject of the 1992 conference until trial counsel raised the question. Dr. O'Brien had no memory of specific communications made during the course of the conference, nor had any other independent recollection of the meeting.

¶ 15 The psychiatrist-client privilege as set forth in § 5944 provides in relevant part as follows.

No psychiatrist ... shall be, without the written consent of **his client**, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of **such client**. The confidential relations and communications between a psychiatrist and **his client** shall be on the same basis as those provided or prescribed by law between attorney and client.

42 Pa.C.S. § 5944 (emphasis added). In *Commonwealth v. Fewell*, 439 Pa.Super. 541, 654 A.2d 1109 (1995), this court stated:

The privilege afforded by § 5944 was intended to inspire confidence in the client and to encourage full disclosure to the psychologist [and psychiatrist]. By preventing the latter from making public any information which would result in humiliation, embarrassment or disgrace to the client, the privilege is designed to promote effective treatment and to insulate the client's private thoughts from public disclosure.

654 A.2d at 1112–13 (*quoting Commonwealth v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120, 129 (1987), *appeal denied*, 518 Pa. 617, 541 A.2d 744 (1988)).

¶ 16 The privilege is clearly designed for protection of confidential communications from a client to his physician. *Commonwealth v. Simmons*, 719 A.2d 336 (Pa.Super.1998). It is the preservation of the confidential relationship which is sought to be protected. *Fewell, supra.* In this case, appellant was never a client or patient of Dr. O'Brien. In 1992, there was no confidential relationship between appellant and Dr. O'Brien, nor an exchange of any communications, which would be protected by the psychiatrist-patient privilege and require preclusion of Dr. O'Brien's testimony.

¶ 17 Appellant also contends that the attorney-client privilege as provided by § 5916 should also have operated as a bar to the testimony. That section provides:

In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S. § 5916.

¶ 18 Appellant argues Dr. O'Brien used information obtained from that 1992 conference, particularly that du-

Pont had been abusing alcohol and using cocaine, in formulating his expert opinion given at trial. This, he contends, is an impermissible violation of the attorney-client privilege. It is true that the attorney-client privilege does extend to an agent of an attorney who assists in the provision of legal advice to the client. *Commonwealth v. Noll*, 443 Pa.Super. 602, 662 A.2d 1123 (1995), *appeal denied*, 543 Pa. 726, 673 A.2d 333 (1996). Certainly attorneys today often consult with and rely upon the advice of other professionals to assist them in providing legal services. However, application of the privilege requires confidential communications made in connection with providing legal services. *Commonwealth v. Boggs*, 695 A.2d 839 (Pa.Super.1997), *appeal denied*, 553 Pa. 686, 717 A.2d 1026 (1998). The record does not support appellant's contention that the privilege was violated in this case. There is no evidence that confidential attorney-client communications were divulged in the December 1992 meeting. From the record one can only conclude that appellant's attorney consulted with several psychiatrists four years prior to the shooting, in an effort to determine how best to obtain an evaluation of appellant's mental health, and was completely unrelated to any provision of legal services. In addition, there is no evidence of record to establish any attorney-client relationship between defense counsel and Dr. O'Brien with respect to the present case.

¶ 19 This is not a situation where a consultation was sought by defense counsel to explore an insanity defense at trial. *See, U.S. v. Alvarez*, 519 F.2d 1036 (3ʳᵈ Cir.1975). Nor does the record establish that Dr. O'Brien received, retained or used any information from the conference. Dr. O'Brien testified that he had no recall of that meeting. His testimony at trial in-cluded detailed explanation of the sources of information he used at arriving at his diagnosis of appellant, which sources are specifically set forth in Commonwealth Exhibit 40, and include numerous psychiatric and police investigation reports as well as interviews of over thirty individuals familiar with appellant. There was testimony by several witnesses at trial that appellant abused alcohol and cocaine between 1988 and 1995, and expert witnesses for both sides were questioned on the effect of drug use on appellant's mental health. The record simply does not support the conclusion that the attorney-client privilege was violated in any way by the admission of Dr. O'Brien's testimony.[8] Finding no violation of either the psychiatrist-patient or attorney-client privilege, we thus conclude that the trial court did not err when it permitted the Commonwealth to present Dr. O'Brien's testimony as an expert psychiatric witness at appellant's trial.

## II. Constitutionality of the "Guilty but Mentally Ill" Statute

¶ 20 Next appellant challenges the constitutionality of the application of the Pennsylvania statutes relating to "Guilty but mentally ill" and "Not guilty by reason of insanity." Those provisions, in relevant part, are as follows.

§ 314. **Guilty but mentally ill**

(a) **General rule.**—A person who timely offers a defense of insanity in accordance with the Rules or Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

---

8. We also note that the Commonwealth has been permitted to present rebuttal testimony of an expert psychiatric witness who was originally retained by the defense in preparation for trial, but whose opinion was favorable to the Commonwealth on the issue of sanity. *See Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996). Appellant's previous contact with Dr. O'Brien is clearly much more limited than that of a defendant seeking evaluation for purposes of preparation of an insanity defense at trial.

**(c) Definitions.** . . .

*(1) "Mentally ill."* One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

*(2) "Legal insanity."* At the time of the commission of the act, the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know he was doing what was wrong.

18 Pa.C.S. § 314.

### § 315. Insanity

**(a) General rule.**—The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.

**(b) Definition.**—For purposes of this section, the phrase **"legally insane"** means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

18 Pa.C.S. § 315.

¶ 21 Appellant contends there is a conflict between these two provisions. In his interpretation, the Commonwealth must prove beyond a reasonable doubt that the actor was *not* legally insane pursuant to § 314, but the defense bears the burden to show by a preponderance of the evidence

9. *Regina v. M'Naghten,* 10 Cl. & Fin. 200, 9 Eng. Rep. 718 (1843). This rule, first applied in Pennsylvania in *Mosler, supra,* is codified in § 315 of the Crimes Code. *See also, Com-*

that he *was* legally insane pursuant to § 315. He concludes that the constitutional guarantees of due process and equal protection are violated by the application of the contradictory statutes. In support of this argument, appellant asks this court to conclude that the decision of *Commonwealth v. Trill,* 374 Pa.Super. 549, 543 A.2d 1106 (1988), *appeal denied,* 522 Pa. 603, 562 A.2d 826 (1989) was wrongly decided, and to seek guidance from the interpretations of courts in other jurisdictions of their own statutes relating to insanity and mental illness.

¶ 22 We first point out that this Commonwealth has been consistent in its application of the M'Naghten rule since *Commonwealth v. Mosler,* 4 Pa. 264 (1846).[9] *Commonwealth v. Reilly,* 519 Pa. 550, 549 A.2d 503 (1988). We also note that our Supreme Court addressed the issue of the burden of proof required by the language of Sections 314 and 315 in *Commonwealth v. Sohmer,* 519 Pa. 200, 546 A.2d 601 (1988). There, the Court recognized that a defendant's sanity is presumed; that the burden of establishing insanity, by a preponderance of the evidence, is on the defendant; and further, that neither the defendant nor the Commonwealth had the burden of establishing mental illness, because that was a factual determination to be made from the evidence as a whole. *Sohmer* did not address the constitutionality of the statutes, however.

¶ 23 Legislation enacted by the General Assembly carries a strong presumption of constitutionality, and the party challenging the constitutionality of any statute bears a heavy burden of demonstrating that the statute is clearly, palpably and plainly unconstitutional. *Commonwealth v. Burnsworth,* 543 Pa. 18, 669 A.2d 883 (1995). Appellant contends that application of Section 314 is unconstitutional. His argument is that the Common-

*monwealth v. Banks,* 513 Pa. 318, 521 A.2d 1 (1987); *Commonwealth v. Hicks,* 483 Pa. 305, 396 A.2d 1183 (1979); *Trill, supra.*

wealth should bear the burden of proving, beyond a reasonable doubt, that a defendant did not satisfy the M'Naghten test. In other words, appellant believes that when an insanity defense is proffered, constitutionally the burden should be on the Commonwealth to prove, beyond a reasonable doubt, that the defendant was not insane and knew that what he was doing was wrong.

¶ 24 In *Trill, supra,* a panel of this court conducted an extensive review of §§ 314 and 315, and specifically rejected the argument that § 314 was unconstitutional. The court explained that the legislature had recognized two classifications of persons in those sections: the person who is "sick and bad", or guilty but mentally ill, and the person who is "sick" or insane. It went on to explain that in applying the two sections, several sequential steps of inquiry must be made by the fact finder. First, a determination is made as to whether the Commonwealth has proven the defendant's guilt of every element charged beyond a reasonable doubt. Second, a determination must be made as to whether the defendant has proven insanity by a preponderance of the evidence. If so, the defendant is acquitted. If not, the third step requires a determination of whether the facts establish beyond a reasonable doubt that the defendant is mentally ill. In addressing the equal protection and due process arguments, the panel concluded as follows.

> Our legislature settled upon what they believed to be the most comprehensive legal definitions available to describe the terms "mentally ill" and "legal insanity" and incorporated them into Pennsylvania's guilty but mentally ill statutory scheme. The definition of "legal insanity" derived from the well-engrained common-law M'Naghten standard for insanity, whereas the definition of "mentally ill" emanated from the American Law Institute's insanity standard. *See* ALI Model Penal Code § 4.01(1) (Proposed Official Draft 1962). By transpos-

ing the ALI definition into one for mental illness, the legislature accomplished what they believed to be a logical corollary to the M'Naghten rule. We will not second-guess the rectitude of this choice.

543 A.2d at 1129. *See also, Commonwealth v. Zewe,* 444 Pa.Super. 17, 663 A.2d 195 (1995), *appeal denied,* 544 Pa. 629, 675 A.2d 1248 (1996)(Pennsylvania's "guilty but mentally ill" statute does not violate due process or equal protection); *Commonwealth v. Eck,* 439 Pa.Super. 530, 654 A.2d 1104 (1995)(rejecting appellant's invitation to adopt the Model Penal Code definition of "insanity", which is the same as Pennsylvania's "guilty but mentally ill" definition; and recognizing that the constitutionality of § 314 has repeatedly been upheld); *see also, Rock v. Zimmerman,* 959 F.2d 1237 (3rd Cir.1992), *cert. denied,* 505 U.S. 1222, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992)(recognizing that Pennsylvania follows the "classic" M'Naghten test for insanity). Were this a case of first impression in this Commonwealth, we might lend more credence to appellant's constitutional arguments. However, we are not persuaded that this court should decline to follow the precedents established in *Trill* and *Sohmer.* The allocation of the burden of proof where insanity is a defense has been clearly defined, and challenges to the constitutionality of the relevant statutes have previously been rejected. We therefore conclude there is no merit to appellant's argument that the application of Sections 314 and 315 was unconstitutional.

¶ 25 Appellant also argues that the distinction between the definitions of mental illness and insanity are slight, that a person could satisfy both definitions, and that a jury is therefore required to choose between one or the other. He contends this flaw is further compounded by the instructions given to the jury which permitted it to select either a verdict of "insane" or "guilty but mentally ill." However, appellant misapprehends the step-by-step analysis set forth in *Trill* and *Sohmer,* and given by the trial court to the jury in its

instructions, as well as by the progression of questions on the verdict slip.

¶ 26 The trial court charged the jury on "guilty but mentally ill" and "legal insanity" using Pennsylvania Suggested Standard Jury Instruction (Criminal) 5.01A(1). This instruction has been specifically approved by this court, and correctly sets forth the present state of the law in the Commonwealth. *Commonwealth v. Bowers*, 400 Pa.Super. 377, 583 A.2d 1165 (1990), *appeal denied*, 528 Pa. 627, 598 A.2d 281 (1991); *Trill, supra*. The jury was required to determine first whether the Commonwealth had proven each element of the crimes charged beyond a reasonable doubt. Next the jury was instructed to determine whether appellant established that he was legally insane at the time of the shooting. Finally, and only if a finding of insanity was not made, the jury was to decide whether appellant was guilty but mentally ill based upon the evidence. We find no error in the instructions given by the trial court which are consistent with the law of this Commonwealth.

¶ 27 Finally with respect to the mental illness issue, appellant contends that he has been subjected to cruel and unusual punishment based on the verdict, because he has been imprisoned as a result of his mental illness. Appellant reiterates that he could be considered "insane" under the ALI definition of insanity as well as under statutes of other jurisdictions. As previously stated, appellant was found guilty but mentally ill based on application of Pennsylvania law. The jury did not determine him to be legally insane. There is no prohibition in the Constitution against punishment simply because the law in other jurisdictions differs and might yield another penalty. This argument is also without merit.

## III. Evidence of Prior Bad Acts

¶ 28 We next turn to appellant's contention that the trial court erred when it admitted evidence of prior bad acts. Evidence of other crimes or prior bad acts is generally inadmissible except "in certain circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character." *Commonwealth v. Lark*, 518 Pa. 290, 302, 543 A.2d 491, 497 (1988). These special circumstances permit the introduction of such evidence where the probative value of the evidence outweighs the prejudice against the defendant.

> [E]vidence of other crimes [may] be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial[.]

*Id., quoting Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715, 720 (1981). Such evidence is also admissible when it is part of the sequence of events forming the history of the case as a part of the natural development of the facts. *Commonwealth v. Thomas*, 552 Pa. 621, 717 A.2d 468 (1998). These evidentiary issues are within the sound discretion of the trial court. *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987), *cert. denied*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987).

¶ 29 Appellant first argues that the Commonwealth's evidence relating to his prior drug use was improperly admitted. However, a review of the record reveals that it was appellant's experts who first introduced the subject. As the trial court noted, it was a defense expert who made the first references to appellant's drug use, when he opined on direct examination that appellant's mental illness was not the result of substance abuse. Several other defense witnesses, both lay and expert, made detailed reference in their testimony to appellant's use of cocaine and

alcohol. The cause of appellant's mental illness was clearly crucial to the defense, and consideration of his substance abuse, particularly by his expert witnesses, was an indispensable facet of establishing the history of that mental illness. Testimony by Commonwealth witnesses related to appellant's drug use was not presented until after the defense rested, and was offered specifically to rebut appellant's evidence that his mental illness was not a cocaine-induced psychosis.

¶ 30 In addition, appellant's arguments that the evidence of cocaine use was too remote in time must also fail. His experts testified at length as to a change in his demeanor and behavior beginning with his mother's death in 1988 and continuing beyond the shooting. This testimony reflected the defense position that appellant had a history a mental illness. Evidence of any behavior during that time period which reflected appellant's mental state, including substance abuse, was clearly relevant, and the weight to be afforded the evidence was a question for the jury. We find no error.

¶ 31 Next appellant challenges the admission of testimony that appellant had allegedly admitted to being involved in a hit and run accident in December 1987. This evidence, admitted over defense objection, was offered to illustrate appellant's state of mind and ability to appreciate the nature and quality of his acts during a crucial time period in this case, and was not merely evidence of a prior bad act. According to the defense, appellant was already exhibiting signs of mental illness

at least by 1988, very near in time to the alleged accident. Certainly this evidence was probative as part of the natural history of this case, particularly appellant's history of mental illness. We conclude the trial court did not abuse its discretion when this relatively brief testimony was introduced. *Thomas, supra.*

¶ 32 We also reject appellant's further contentions that he was prejudiced by evidence of the following other "bad acts".[10] Testimony by Mrs. Schultz that appellant sometimes was speeding in his automobile near her home was relevant to the deterioration of the relationship between the Schultzes and appellant, and was probative of appellant's behavior during late 1995. Testimony of Dr. Dietz, one of the Commonwealth experts, that Mr. Schultz and others were concerned in November 1995 about appellant's decisions to remove several African–American wrestlers from the team, was also probative and relevant to appellant's behavior in late 1995. The other specified bad acts[11] were also limited to brief testimony, and also offered for legitimate purposes: specifically, appellant's behavior during the critical time period of 1993–1996. The probative value of the prior bad acts now challenged by appellant was not outweighed by any prejudicial effect. In addition, we note that the trial court gave detailed, appropriate cautionary instructions to the jury that the evidence of prior bad acts or bad behavior was limited in its application. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). We find no prejudice to

---

10. We note that appellant agrees with the Commonwealth's contention that appellant's defense counsel did not object to each and every instance of "bad acts" testimony which he now challenges on appeal. Appellant argues continuous objections would have been futile. In an abundance of caution, we address these instances of prior bad acts evidence on the merits.

11. A witness was questioned whether appellant threw firecrackers at a pack of llamas on his estate; another witness stated appellant

flew a flag of his own above the American flag; another witness stated appellant fired a wrestler; another witness testified appellant did not indicate any religious preference when he filled out a form.

A defense witness was questioned on direct examination about appellant's interest in the Third Reich and spoke of appellant's Nazi memorabilia. Clearly evidence of bad acts which was proffered by appellant presumably in support of his insanity defense cannot now be considered objectionable.

appellant, nor abuse of the trial court's discretion.

## IV. Admission of Hearsay Evidence and the Confrontation Clause

¶ 33 Appellant next argues the trial court erred when it admitted hearsay evidence by the Commonwealth's two psychiatric experts, Dr. O'Brien and Dr. Dietz, over objection of defense counsel. Specifically, appellant challenges testimony by these witnesses as to certain out of court statements made by Georgia Dusckas, an employee of appellant, as to her observations of appellant's actions and demeanor prior to and on the day of the shooting, as well as her general familiarity with appellant's deteriorating relationship with Mr. Schultz.[12] Ms. Dusckas was not called to testify at trial by either the Commonwealth or the defense.

¶ 34 Appellant acknowledges that experts are generally permitted to rely on out of court statements in forming their opinions; however, he contends that Drs. O'Brien and Dietz did not rely on Ms. Dusckas' statements prior to reaching their respective opinions. Rather, he argues, the witnesses were permitted to use her statements merely to corroborate their own testimony, and the jury had no means of assessing the reliability of the limited portions of her statement referred to by the doctors. Further, appellant contends his right of confrontation has been violated because there was no showing that Ms. Dusckas was unavailable, nor was there reliable indication of trustworthiness of these statements. The result, he concludes, is that the admission of these statements directly impacted the jury's finding

that appellant was not insane at the time of the shooting.

¶ 35 It is well established law in the Commonwealth that a medical expert is permitted to rely on reports of other persons which do not appear of record in forming his opinion, provided such matters are customarily relied upon in the practice of his profession. *Commonwealth v. Elliott*, 549 Pa. 132, 700 A.2d 1243 (1997); *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971). The record is clear that the medical experts presented by both the Commonwealth and defense relied extensively on reports of numerous other persons, many of which were not part of the evidence presented at trial. Moreover, appellant's assertions that Drs. O'Brien and Dietz did not consider Ms. Dusckas' statement in formulating their expert opinions are belied by the record. Both doctors specifically referred to the statements of Ms. Dusckas as information on which they relied in arriving at their respective conclusions at trial regarding appellant's mental state on the day of the shooting.

¶ 36 In addition, appellant's argument that his right of confrontation has been violated by testimony regarding Ms. Dusckas' statements is likewise without merit. The cases on which appellant relies simply do not support his contention that portions of her out of court statements were improperly admitted because she was not unavailable, she was not subject to cross-examination, and no indicia of the reliability of the statements existed.

¶ 37 There is no requirement in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct.

---

12. Appellant states in his brief that Ms. Dusckas' statement is over 200 pages in length, yet the Commonwealth's witnesses referred only to several isolated portions of her statement. He specifically points out testimony regarding "her own perceptions about duPont's temper; his delusional statements; his relationship with Schultz; and his actions on returning to the mansion ... a perspiration soaked T-shirt discarded after the shooting; the lack of delusional statements on the day of the incident;

and the timing of events on the day of the shooting." (Appellant's Definitive Brief at 51–52)(references to Reproduced Record omitted). Appellant also states that "Dietz also improperly referenced statements of Kenny Munday, who did not testify at trial." This reference was to a November 1995 statement of Mr. Munday relating to appellant's having removed several African American athletes from the team. This reference was discussed *supra* at pp. 981–82.

2531, 65 L.Ed.2d 597 (1980), in a Confrontation Clause analysis, that a declarant be unavailable, unless the challenged statements were made during a prior court proceeding. *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). The underlying purpose of the Confrontation Clause is promotion of the "integrity of the fact-finding process." *White, supra*, at 356–57, 112 S.Ct. 736 (citations omitted). In a case where there is substantial compliance with the purpose of the Confrontation Clause, actual confrontation of the declarant is not required. *See, e.g., Roberts, supra*. "[W]here proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *White, supra*, at 356, 112 S.Ct. 736. As a panel of this court recognized in *Primavera v. Celotex Corp.*, 415 Pa.Super. 41, 608 A.2d 515 (1992), *appeal denied*, 533 Pa. 641, 622 A.2d 1374 (1993), "The fact that experts reasonably and regularly rely on [out of court] information merely to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes." 608 A.2d at 520. That is not to say that an expert may simply transmit hearsay statements, of course; the intent is to permit an expert to rely on sources of information used in the ordinary practice of the profession, and to disclose those sources to the jury. *Id.* Both Dr. O'Brien and Dr. Dietz, as well as the numerous other medical experts, testified as to the sources they reviewed and considered in formulating their opinions, including the statements of Ms. Dusckas. In light of the foregoing, we conclude the trial court's admission of these statements was not error.

## V. Argument of the Prosecution

¶ 38 Appellant next contends the trial court erred when it permitted the prosecutor to argue that an adverse inference could be drawn by the defense's failure to present an entire videotaped interview rather than an edited portion, and then further compounded the error by instructing the jury that such an inference was a permissible one. During the testimony of Dr. Resnick, a defense expert, he explained that he had edited a videotaped interview he conducted of appellant and showed the edited portion to the jury to illustrate his testimony. No other portion of the videotape was played by either the Commonwealth or the defense. During closing argument the Commonwealth stated the following.

> You saw the Defendant on tape but you didn't see the whole tape. You saw an edited tape .... The reason you didn't see the whole tape was because in some of the other tapes [sic] are where he's most clearly pressed and asked to address the issue of, well, "You got a problem with me?" and "Were you afraid of Dave Schultz?" He denies that. Were you ever afraid of him? Do you know it's wrong to kill a human being? He agrees to that. And well, can you imagine never having anger at David Schultz? I'm not going to talk about that. I'm not going to talk about that.

N.T. 2/18/97, p. 3096. Defense counsel objected at sidebar, and requested that the court instruct the jury that it should not consider evidence which was not before them. The trial court denied this request, but granted the defense's alternative request, that the jury be instructed that the entire tape was available to both sides. The relevant portion of the charge is as follows:

> Finally, once again, ladies and gentlemen, the speeches of counsel are not part of the evidence and you should not consider them as such.

> However, in deciding the case you should carefully consider the evidence in light of the various reasons and arguments that have been presented by each attorney.—

I've stated earlier, ladies and gentlemen, that counsel make references to both facts and to inferences that they feel may be logically drawn from the facts.

For instance, the Commonwealth's counsel stated in closing that the portion of the videotape used by Dr. Resnick that was edited out, that you did not see, was less favorable to the defendant than the portion which was viewed.

This is, of course, an inference that the Commonwealth's attorney has drawn and is suggesting to you that you are not bound by that inference [sic]. You may either accept it or reject it, keeping in mind that the entire tape was available to both parties in the case.

N.T. 2/18/97, p. 3128.

¶ 39 It is well established that a prosecutor is permitted to vigorously argue his case, as long as the comments made are supported by evidence and any inferences may be reasonably derived from the evidence. *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995). The remarks must be examined in the context in which they were made, and will not be deemed improper if they simply constitute oratorical flair. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998).

¶ 40 In this case, the remarks by the prosecution relating to the unshown portions of the videotape were directly based on evidence of record. The jury was aware before the videotape was shown that it was an edited version, and that the Commonwealth had possession of the entire tape. On cross-examination, both Dr. Resnick and Dr. Sadoff were specifically questioned about appellant's comments on the edited portion of the tape, including his fear of Mr. Schultz and the statement, "You got a problem with me?" There was testimony by several witnesses, including Drs. Resnick and Sadoff, as to whether appellant knew it was wrong to kill a human being. Because the challenged portion of the prosecution's closing argument was based on evidence of record, it was not improper. Furthermore, the trial court's instructions to the jury were clear statements of well settled law in the Commonwealth. The cases cited by appellant to support his argument relate specifically to missing witness instructions, and have no application to this case. We therefore conclude this argument is without merit.

## VI. The Verdict Slip

¶ 41 Next appellant contends he "was prejudiced by the use of a misleading verdict sheet containing written jury instructions." Appellant's Definitive Brief at 62.[13] Trial counsel did not object to the

13. The full text of the Verdict Slip is as follows.
1. Do you find that the Defendant, John E. duPont, shot and killed David Schultz? Choose one answer on which you all agree. YES ___ NO ___.
If your answer to Question # 1 is Yes, proceed to Question # 2. If your answer to Question # 1 is NO, proceed to Question # 6.
2. Do you find that the Defendant, John duPont is not guilty because he was legally insane at the time he shot and killed David Schultz? Choose one answer on which you all agree. YES ___ NO ___
If your answer to Question # 2 is Yes, return to the Courtroom. Your job is finished. Do not answer any further questions. If your answer to Question # 2 is NO, proceed to Question # 3 below.
3. What is your verdict on the charge of criminal homicide by Murder in the First Degree? Choose one verdict on which you all agree.
NOT GUILTY ___ GUILTY ___ GUILTY BUT MENTALLY ILL ___
If you find the Defendant Not Guilty, proceed to Question # 4. However, if you find the Defendant either Guilty, or Guilty But Mentally Ill, do not answer any further questions relating to criminal homicide, and instead proceed directly to Question # 6.
4. What is your verdict on the charge of criminal homicide by Murder in the Third Degree? Choose one verdict on which you all agree.
NOT GUILTY ___ GUILTY ___ GUILTY BUT MENTALLY ILL ___
If you find the Defendant Not Guilty, proceed to Question # 5. However, if you find the Defendant either Guilty, or Guilty But Mentally Ill, do not answer any further questions

use of the verdict slip, and therefore this issue has been waived. *Commonwealth v. Robinson,* 543 Pa. 190, 670 A.2d 616 (1995). Moreover, we conclude that this argument has no merit.

 ¶ 42 Appellant argues on the one hand that the verdict slip contained improper written instructions to the jury, and also argues on the other hand that it failed to include a definition and an explanation of burden of proof. Our Supreme Court has held that the submission of written jury instructions to a jury for use during deliberations is unfairly prejudicial to a defendant and outweighs any possible benefit. *Commonwealth v. Karaffa,* 551 Pa. 173, 709 A.2d 887 (1998); *Commonwealth v. Oleynik,* 524 Pa. 41, 568 A.2d 1238 (1990). However, the cases cited by appellant are inapposite to the case *sub judice,* as each of those cases involved disapproval of a verdict slip containing definitions or other written notations referencing evidence produced at trial.[14] There were no definitions or other notations on the verdict slip in the present case which consisted simply of seven questions for the jury to answer pursuant to the trial court's oral instructions.

 ¶ 43 Appellant also argues the verdict was a "progression charge" which could have led the jurors to conclude that a hung jury was not possible. This court has previously determined progression charges to be proper in homicide cases. *Commonwealth v. Loach,* 421 Pa.Super. 527, 618 A.2d 463 (1992), *appeal denied,* 535 Pa. 655, 634 A.2d 219 (1993); *Commonwealth v. Hart,* 388 Pa.Super. 484, 565 A.2d 1212 (1989), *appeal denied,* 525 Pa. 642, 581 A.2d 569 (1990). Moreover, appellant has cited no authority for the proposition that the jurors should have been informed that no verdict was a possible outcome in this case. The jury deliberated for seven days before reaching a verdict, and there is absolutely no indication that the jurors were coerced or misled into believing that the trial court in any way demanded that a verdict be reached. We conclude this argument is also devoid of merit.

## VII. Discretionary Aspect of Sentence and Bill of Costs

· ¶ 44 Appellant next challenges the discretionary aspect of his sentence.[15] Immediately prior to sentencing, the trial court held a hearing to determine whether appellant was a severely mentally disabled individual in need of treatment,[16] and found that he was. The trial court sentenced him to a term of imprisonment of thirteen years to thirty years on the mur-

---

relating to criminal homicide, and instead proceed directly to Question # 6.
5. What is your verdict on the charge of criminal homicide by Voluntary Manslaughter?
Choose *one* verdict on which you all agree.
NOT GUILTY ___ GUILTY ___ GUILTY BUT MENTALLY ILL ___
Proceed to Question # 6.
6. What is your verdict on the charge of Simple Assault on Patrick Goodale? Choose one verdict on which you all agree.
NOT GUILTY ___ GUILTY ___ GUILTY BUT MENTALLY ILL ___
Proceed to Question # 7.
7. What is your verdict on the charge of Simple Assault on Nancy Schultz? Choose one verdict on which you all agree.
NOT GUILTY ___ GUILTY ___ GUILTY BUT MENTALLY ILL ___

**14.** *Commonwealth v. Todaro,* 549 Pa. 545, 701 A.2d 1343 (1997)(written definitions of causa-

tion and the individual crimes with which defendant was charged); *Oleynik, supra* (written definitions of individual crimes charged); *Commonwealth v. Kelly,* 484 Pa. 527, 399 A.2d 1061 (1979)(written notations referring to evidence produced at trial); *Commonwealth v. Byrd,* 409 Pa.Super. 611, 598 A.2d 1011 (1991)(written definitions of crimes charged).

**15.** Appellant failed to include in his original brief a concise statement of reasons relied upon with respect to the discretionary aspect of sentence as required by Pa.R.A.P. 2119(f) and *Commonwealth v. Tuladziecki,* 513 Pa. 508, 522 A.2d 17 (1987). This court granted his request to supplement his brief to include this statement by Order dated March 4, 1999.

**16.** 42 Pa.C.S. § 9727.

der conviction, a concurrent term of three to six months on the simple assault conviction, and imposed the costs of prosecution in the sum of $742,107.20. Appellant contends that the sentence was unreasonable under the circumstances, and that the bill of costs imposed is excessive.

¶ 45 Generally, the imposition of sentence is a matter vested within the sound discretion of the trial court. *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893 (1996). To constitute an abuse of discretion, the sentence must either exceed statutory limits or be manifestly excessive. *Commonwealth v. Ellis*, 700 A.2d 948 (Pa.Super.1997). In addition, review of the discretionary aspects of sentence is not automatic; we must first make a determination whether appellant has stated a substantial question that the sentence was not appropriate under the Sentencing Code to warrant our review. *Id.*

¶ 46 Appellant contends that the sentence was unreasonable because the trial court improperly considered his age and mental illness, a letter from the police chief who was neither a victim nor a family member, and the fact that the legislature in May 1995 had increased the sentence for third degree murder from ten to twenty years to twenty to forty years but the guidelines had not yet been revised accordingly. An allegation that the sentencing court gave improper consideration to certain factors generally does not raise a substantial question. *Commonwealth v. Nixon*, 718 A.2d 311 (Pa.Super.1998). In addition, an argument that the sentence is excessive when it falls within statutory limits also fails to raise a substantial question. *Id.* However, given the nature of this case, and in an abundance of caution, we shall address appellant's argument on the merits.

¶ 47 A person convicted of third degree murder may be sentenced to the statutory maximum penalty of forty years. 18 Pa. C.S. § 1103. Appellant's sentence was clearly within the statutory limit for the crime. The fact that the trial court acknowledged that the penalty for third degree murder had changed is of no consequence, particularly in light of her decision to apply the former guidelines as requested by the defense. We shall briefly address the factors which appellant contends the trial court considered improperly resulting in an excessive sentence.

¶ 48 First, he objects to the court's consideration of a hearsay statement by reference to a sentence in a letter the trial court received from the chief of police of Newton Township where the crimes occurred. During the sentencing hearing, the trial court made reference to the one sentence as follows: "[T]he overwhelming opinion here is that we lost two friends the day of the killing and it remains in our minds as a very bad dream." [17] We note first that in sentencing, a court is not limited only to consideration of information which would be admissible evidence at trial. *Commonwealth v. Charles*, 339 Pa.Super. 284, 488 A.2d 1126 (1985); *Commonwealth v. Knepp*, 307 Pa.Super. 535, 453 A.2d 1016 (1982). In addition, the impact on the community is a relevant consideration in imposing a sentence. 42 Pa.C.S. § 9721. We find no abuse of discretion in the trial court's consideration of this one statement.

¶ 49 Next appellant contends the trial court did not properly consider his age and mental illness as mitigating factors. This assertion is clearly belied by the record made at the sentencing hearing, when the trial court specifically referenced appellant's age and mental illness as mitigating factors. In considering whether a sentence was manifestly excessive, we must give great weight to the discretion of the sentencing judge who was in the best position to measure various factors for consideration. *Ellis, supra.* The record made at the sentencing hearing clearly supports the conclusion that the trial court was

---

**17.** N.T., Sentencing Hearing, 5/13/97 at p. 318.

aware of and considered all relevant factors in imposing an appropriate sentence. *See, Commonwealth v. Cappellini*, 456 Pa.Super. 498, 690 A.2d 1220 (1997). Her decision to depart from the former guidelines was not unreasonable and is well supported by this record. *Nixon, supra.*

¶ 50 Appellant also argues that the bill of costs taxed against him was excessive because it included the cost of a special assistant district attorney as well as several legal interns. Costs assessed against a criminal defendant include the expenses incurred by the district attorney in connection with the prosecution. 16 P.S. § 1403; *Commonwealth v. Moran*, 450 Pa.Super. 283, 675 A.2d 1269 (1996). The trial court conducted a hearing on the bill of costs submitted by the Commonwealth, which revealed that the district attorney's office had had two vacancies during the initial stages of prosecution of this case. In an effort to meet its obligations in this and all other cases in which it was required to prosecute, the district attorney's office engaged the services of a special prosecutor, and also assigned to legal interns the task of conducting various research projects related to this protracted prosecution. The trial court found that these costs were reasonable and necessary to meet the demands of this high profile, complex case. The voluminous record clearly supports this finding. We perceive no basis on which to conclude that the trial court's determination of necessary costs was erroneous.

¶ 51 For the foregoing reasons, and having determined that there is no merit to the issues raised in this appeal, the judgment of sentence must be affirmed.

¶ 52 Judgment of sentence affirmed.