COMMONWEALTH of Pennsylvania,
Appellant,

v.

Brett STEWART, Appellee.

Superior Court of Pennsylvania.

Argued May 20, 1999.
Filed Sept. 13, 1999.
Reargument Denied Nov. 19, 1999.

Michael Erlich, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Kathleen E. Martin, Philadelphia, for appellee.

Before CAVANAUGH, JOYCE and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶ 1 The Commonwealth appeals from an order granting appellee's motion to sup-

press physical evidence.[1] After a careful review of the relevant case law and the record, we reverse.

¶ 2 The evidence at the suppression hearing revealed the following facts. At approximately 3:00 a.m. on Saturday, June 8, 1996, Javon Jones and Bobby Mahalati were en route to an after-hours club when they encountered appellee, Brett Stewart, and his co-defendant, Shawney Perry, in Center City Philadelphia. Perry was driving a white Lexus, which had stopped at a green light and was blocking a lane of traffic, while he and his passenger, Stewart, talked with women who were in another car. After Jones pulled his vehicle alongside the Lexus just as the light turned red, Stewart turned to him and said, "What the f* * * you looking at?"

¶ 3 Jones and Mahalati ignored Stewart's remark; and when the light turned green, they drove around the defendants' vehicle and to the entrance of the nightclub. As Jones's car was stopped in front of the club, Perry pulled up along the passenger side of the vehicle, which was where Mahalati sat. Perry said, "What the f* * * you looking at?" and "What do you want to do? Do you want to f* * * [with] us?" Mahalati responded, "All right. Whatever, p* * * *." At that point, Perry and Stewart drove to the end of the block and turned left on the corner. They positioned their car on the street so as to leave barely enough room for traffic. When Jones turned the corner, he and Mahalati saw that Perry and Stewart were holding guns. While Jones attempted to speed away, Mahalati heard the sound of gunfire and then suddenly lost feeling in his legs after he was shot in the back.

¶ 4 After driving around the block, Jones approached Officer Tyrone Forrest, who observed a bullet hole on the side of the vehicle and blood on the seat. After speaking with Jones, Officer Forrest broadcast an alert over the police radio at 2:59 a.m., stating that a man had been shot in the back and that his assailants were two black males who had fled southbound on 8th Street in a two-door white Lexus. Officer John Barker was patrolling the area when he received the bulletin over the police radio; one minute later, he observed Perry and Stewart driving their two-door white Lexus south on 8th Street. Officer Barker followed the car and requested backup support. Sergeant Glenn Katz responded to Officer Barker's request, and both officers stopped the Lexus and directed Perry and Stewart out of the car. Perry and Stewart were patted down as a safety precaution, but no weapons were found on their persons.

¶ 5 The officers directed Jones to the site where the defendants were apprehended in order to make an identification. Upon seeing Perry and Stewart, Jones immediately shouted "that's them and they have two guns," after which the defendants were taken into custody. Jones further noted that at least one of the guns appeared to be a 9–mm "automatic." This information was relayed to Lieutenant Thomas McDevitt, who determined that it was imperative for public safety reasons to recover the missing firearms as quickly as possible. Consequently, he asked Officer Barker to search the defendants' vehicle. Officer Barker shined a flashlight inside the vehicle and noticed that the floor mat in front of the driver's seat was askew. Officer Baker lifted the mat and discovered a loaded 9–mm Helwan. He also discovered a loaded .22 caliber Beretta under the floor mat on the passenger side. No other search was conducted.

¶ 6 Defendants were held for trial for attempted murder, aggravated assault, criminal conspiracy, and other related charges. On March 9, 1998, defendants received a joint suppression hearing, dur-

---

1. A companion case, *Commonwealth v. Perry*, No. 1314 PHL 1998, was also appealed by the Commonwealth. The two cases involve the same order and issues. A separate Memoran-dum disposing of *Commonwealth v. Perry* has been filed contemporaneously with this Opinion.

ing which they claimed that the police had conducted an unreasonable search and seizure by removing their guns from the vehicle. After hearing the evidence, the suppression court determined that the police had lawfully stopped the defendants' vehicle for investigation and that the identification of Perry and Stewart as the gunmen was not unduly suggestive. The court, however, suppressed the firearms seized from the vehicle, finding that the police should not have searched the car for weapons because they did not have a search warrant. The Commonwealth immediately appealed.

¶ 7 When a defendant files a motion to suppress, the Commonwealth bears the burden of establishing by a preponderance of the evidence that the evidence is admissible. Pa.R.Crim.P. 323(h); *Commonwealth v. Labron*, 543 Pa. 86, 669 A.2d 917, 920 (1995), *rev'd*, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), *reaff'd*, 547 Pa. 344, 690 A.2d 228 (1997). When reviewing an order granting a suppression motion, we are guided by the following standard:

"[W]e consider only the evidence of the defendant's witnesses and so much of the Commonwealth evidence that, read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Evans*, [443 Pa.Super. 351,] 661 A.2d 881, 883 (Pa.Super. 1995) [, aff'd. 546 Pa. 417, 685 A.2d 535 (1996) ]. We are bound by only those factual findings made by the suppression court which are supported by the record, and thereafter must determine whether the legal conclusions and inferences drawn from those facts are legitimate. *Commonwealth v. Walker*, 540 Pa. 80, 94, 656 A.2d 90, 98. As a result, we may reverse only if the legal conclusions drawn from the factual findings are erroneous. *Commonwealth v. Rosario*, [438 Pa.Super. 241,] 652 A.2d 354, 365 (Pa.Super. 1994).

*Commonwealth v. Lechner*, 454 Pa.Super. 456, 685 A.2d 1014, 1015–16 (1996).

¶ 8 The Fourth Amendment to the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution require that searches be conducted pursuant to a warrant issued by a neutral and detached magistrate. *Labron*, 543 Pa. at 93, 669 A.2d at 920. A search conducted without a warrant is generally deemed unreasonable for constitutional purposes. *Id.*; *Commonwealth v. Holzer*, 480 Pa. 93, 102, 389 A.2d 101, 106 (1978). But an important exception to the warrant requirement exists: a search of a person's personal property, including an automobile, may be conducted without a warrant when there exists probable cause to search and exigent circumstances necessitating a search. *Commonwealth v. Roland*, 535 Pa. 595, 596, 637 A.2d 269, 270 (1994) (involving a search of a house); *Commonwealth v. Baker*, 518 Pa. 145, 541 A.2d 1381 (1988) (involving a search of an automobile); *Commonwealth v. Curry*, 343 Pa.Super. 400, 494 A.2d 1146, 1148–49 (1995) (involving a search of an apartment); *Commonwealth v. Burgwin*, 292 Pa.Super. 273, 437 A.2d 41, 42 (1981) (involving a search of an automobile).

¶ 9 The United States Supreme Court has recognized an "automobile exception" to the warrant requirement, which has been described as follows: "a search warrant [is] unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible." *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Our Supreme Court has consistently rejected the application of the automobile exception in this Commonwealth and has held that constitutional protections extend to searches and seizures of a person's automobile. *Commonwealth v. Holzer*, 480 Pa. 93, 103, 389 A.2d 101, 106 (1978); *Labron*, 543 Pa. at 95, 669 A.2d at 921. Our Supreme Court, however, has recognized the

special circumstances involved in searching an automobile:

> [I]n considering the reasonableness of a given search or seizure of an automobile, the need for a warrant is often excused by exigent circumstances. The reasons are two-fold. First, a vehicle is highly mobile and the likelihood is therefore great that it and its contents may never be found if police were prohibited from immobilizing it until a warrant can be secured. Second, one's expectation of privacy with respect to an automobile is *significantly* less than that relating to one's home or office.

*Holzer*, 480 Pa. at 103, 389 A.2d at 106 (citations omitted) (emphasis in original).

¶ 10 In an attempt to demonstrate that a search warrant was not required in this case because exigent circumstances existed, the Commonwealth presented the testimony of five witnesses, including Lieutenant McDevitt and Officer Baker. Lieutenant McDevitt testified that he was concerned for the public safety when he directed Officer Baker to search the defendants' car. He explained to the suppression court that, unless the guns were located in the car, the police department would have had to organize an immediate search of the entire route that the defendants had traveled while fleeing through the city in order to recover the weapons. He noted that police resources were low at that time and, based upon his twenty-three years of experience in police enforcement, attempting to obtain a search warrant at approximately 3:00 a.m. on a Saturday morning would have taken several hours. Lieutenant McDevitt summarized the reasons for his actions as follows:

> I know how fragile a 9 millimeter can be, compared to some other weapons. I was concerned it might be laying on the street. You had clubs getting out. If we didn't find it, someone else could have got hurt. A police officer could have got hurt. By the time it would have taken us to get a tow [truck] at

that time of night it would have taken several hours. It could have been several hours before a search warrant was obtained.

> By that time, I could have had children out walking around. I didn't think I could get enough manpower in the three or four districts to go search the entire area that this car had traveled from the time of this shooting.

N.T., 3/10/98, at 257–58.

¶ 11 Officer Barker also testified, stating that he would have checked the automobile for weapons, even if Lieutenant McDevitt did not direct him to do so, because he was concerned for his own safety and the safety of his fellow officers. He noted that the car was still running on the highway when they had the defendants in custody. He testified that, in attempting to drive or park the car, the officers would run the risk that a concealed weapon, particularly one as fragile as a 9–mm gun could "easily go off on the officer, if he hit a bump or stepped on it or kicked it by accident with his foot." N.T., 3/10/98, at 261.

¶ 12 After hearing the testimony of the Commonwealth's witnesses, the suppression court granted the motion, finding that the warrantless search was not lawful because there were no exigent circumstances and the officers did not obtain a search warrant. The court relied upon our Supreme Court's holding in *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995), in which the court stated:

> a search warrant is required before police may conduct any search. As an exception to this rule, police may search a vehicle without a warrant where: (1) there is probable cause to believe that an automobile contains evidence of criminal activity; (2) unless the car is searched or impounded, the occupants of the automobile are likely to drive away and contents of the automobile may never again be located by police; and (3) the police have obtained this information in such a way that they could not have

secured a warrant for the search, i.e., there are exigent circumstances.

*Id.* at 51, 669 A.2d at 900.

¶ 13 The suppression court determined that "[e]xigent circumstances to justify a warrantless search will 'ONLY' be approved in those cases were [sic] all three of the elements required in *White* ... are met." Trial court opinion, 7/23/98, at 4. The court then rejected the Commonwealth's arguments on the following grounds:

> The exigent circumstances which this court was looking for had to do with possible destruction of evidence or where a defendant is likely to drive away with the contents of the automobile, never to be seen again, a case where a weapon is involved, whether or not a defendant happened to be close enough to grab the weapon and/or use it against an officer or someone else.

> The officer who ordered the search said that "Public Safety" was his main concern and wanted to know if weapons were on the street. Our state has always maintained a higher standard of privacy for its citizens than the Federal Court.

Trial court opinion, 7/23/98, at 4.

¶ 14 We note that the *White* Court was wary not to narrowly limit the circumstances that could possibly be considered exigent. The court stated:

> We do not propose to invalidate warrantless searches of vehicles where the police must search in order to avoid danger to themselves or others, as might occur in the case where police had reason to believe that explosives were present in the vehicle. Emergencies such as this, however, are not part of this case.

*White*, 543 Pa. at 57 n. 5, 669 A.2d at 902 n. 5. After a thorough review of the relevant case law in this area, we find that the suppression court applied the exigency exception doctrine too narrowly.

¶ 15 "Exigent circumstances arise where the need for prompt police action is imperative, either because evidence is likely to be destroyed, ... or because there exists a threat of physical harm to police officers or other innocent individuals." *Commonwealth v. Hinkson*, 315 Pa.Super. 23, 461 A.2d 616, 618 (1983); *see also Commonwealth v. Luv*, 557 Pa. 570, 735 A.2d 87, 1999 Pa.LEXIS 2188 (1999) (finding exigent circumstances where there was an unexpected threat that evidence would disappear because the defendant was driving with drugs in the car). When determining whether exigent circumstances exist, a court must balance the individual's right to be free from unreasonable intrusions against the interest of society in quickly and adequately investigating crime and preventing the destruction of evidence. *Id.* "It requires an examination of *all* of the surrounding circumstances in a particular case ... and the inherent necessities of the situation at the time must be scrutinized." *Id.* (emphasis added). The standard cannot be inflexible because the reasonableness of searches must be determined on a case-by-case basis. *Commonwealth v. Williams*, 411 Pa.Super. 586, 602 A.2d 350, 354 (1992).

¶ 16 Among the factors that a court is to consider are:

> "(1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is a strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified."

*Roland*, 535 Pa. at 599, 637 A.2d at 270–71 (quoting *Commonwealth v. Wagner*, 486 Pa. 548, 557, 406 A.2d 1026, 1031 (1979)).

All of the foregoing factors will not exist in every particular case, but that does not render the situation non-exigent. *See Commonwealth v. Williams*, 411 Pa.Super. 586, 602 A.2d 350, 354–55 (1992) (emphasizing that the factors must be balanced against each other and that "the very nature of exigent circumstances makes them unsusceptible to checklists"). Still, "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

¶ 17 In the instant case, we find that the Commonwealth met its burden in demonstrating exigent circumstances and probable cause that excused the requirement of a search warrant. Before we discuss the exigent circumstances in this case, we must first determine whether probable cause for the search existed. "Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent individual in believing that an offense was committed and that the defendant has committed it." *Commonwealth v. Dennis*, 417 Pa.Super. 425, 612 A.2d 1014, 1015–1016 (1992). In determining whether probable cause existed in a particular situation, "a court will not look just at one or two individual factors, but will consider the 'totality of the circumstances' as they appeared to the arresting officer." *Id.*

¶ 18 Clearly, the officers conducting the search had probable cause to suspect that appellee was involved in the shooting. After being flagged down by Jones, Officer Tyrone Forrest observed a bullet hole on the side of the victim's car and blood on the seat. Jones identified Perry and Stewart as the shooters and yelled "that's them and they have two guns" and noted that at least one of the guns was a 9–mm automatic. These facts are more than sufficient to prompt a prudent individual to believe that an offense was committed and that Perry and Stew-

art had committed it. Thus, there was probable cause.

¶ 19 Next, we examine the circumstances that rendered the situation exigent and thereby excused the officers' warrantless search of the defendants' car. The officers received reliable information from Jones that the defendants were carrying at least one automatic gun. When the officers took the defendants into custody and patted them down for security purposes, they did not find any guns on the defendants' persons. The officers were concerned that the defendants threw the gun out of the car and into the street between the time of the shooting and the time of apprehension by the police. If that were the case, then the police would have had to organize a search of the entire route that the defendants had traveled. The situation arose during a Saturday morning, and people at after-hours nightclubs were already coming out into the streets. There was a risk that a third person would be hurt when coming across the gun, which may have been an automatic that was still cocked and ready to fire. On the other hand, if the defendants did not dispose of the gun, then there was a probability that the gun was still in the car. The officers feared that if the gun was cocked and ready to fire and still in the car, it might fire when an officer stepped into the car to turn off the ignition or drive the car to the police precinct. After Lieutenant McDevitt directed Officer Barker to search the car, Officer Barker shined a flashlight into the car and noticed that the floor mat in front of the driver's seat was askew. He lifted the mat and discovered a loaded 9–mm gun under the driver's side floor mat and a .22 caliber Beretta under the passenger side floor mat.

¶ 20 After examining the totality of the circumstances and balancing of all of the relevant factors, we conclude that the circumstances in this case were exigent. The officers were faced with two equally difficult and dangerous situations: innocent persons finding the gun and getting hurt

as they handled it and an officer being injured by the gun as he stepped into the car to turn off the ignition. The officers and the public were in danger if the weapons were not recovered; thus, there was a need for immediate police action. The offense for which the defendants were apprehended was gravely serious. A shooting with at least one automatic weapon was involved and a person was seriously injured as a result. The officers reasonably concluded that the guns were either disposed of by the defendants in the street or were hidden in the car. As discussed above, there was a clear showing of probable cause. Moreover, the level of intrusion into the defendants' expectation of privacy was minimal: the search merely involved the officers lifting the floor mats in the car and removing the guns that they discovered under the mats. Finally, the police conducted the search shortly after a crime was reported. *See Baker*, 518 Pa. at 148, 541 A.2d at 1383 (finding exigent circumstances and considering the factor that the search was conducted when the police stopped a moving vehicle only thirty minutes after a crime was reported), *overruled in part on other grounds*, *Commonwealth v. Rosario*, 538 Pa. 400, 648 A.2d 1172 (1994). Balancing the gravity of the offense and the level of danger confronted by the officers against the level of intrusion, we find that the search was not unreasonable.

¶ 21 We find support for our conclusion from the United States Supreme Court's decision in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles*, the arresting officers responded to a complaint that a man who had just entered a supermarket raped a woman. The officers drove the woman to the supermarket where she identified the appellant, who was at a checkout counter in the supermarket, as her attacker. After seeing the officer, appellant ran toward the rear of the store and the officer pursued him. Eventually, appellant was apprehended in the supermarket. The officer frisked appellant and discovered that he was wearing a shoulder holster but there was no gun in the holster. After handcuffing him, and before reciting appellant's *Miranda* rights, the officer asked appellant where the gun was located. Appellant nodded in the direction of some empty cartons and said "the gun is over there." *Id.* at 652, 104 S.Ct. 2626. Appellant sought to suppress his statement regarding the location of the gun because he was not given his *Miranda* warnings before the officer's questioning. The Supreme Court held that on those facts, there was a public safety exception to the requirement that *Miranda* warnings be given before questioning by officers. The Court stated:

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

> \* \* \* \*

> We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers ... in the untenable position of having to consider, often in a manner of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that

.evidence and neutralize the volatile situation confronting them.

*Id.* at 657–58, 104 S.Ct. 2626.

¶ 22 This Court recognized the *Quarles* Court's reasoning in *Commonwealth v. Bowers*, 400 Pa.Super. 377, 583 A.2d 1165 (1990). In *Bowers*, police were summoned to appellant's house after he shot the victim. They searched the house for appellant but were unable to find either him or the gun used in the shooting. Appellant was later found hiding in an abandoned house across the street from his own home. The arresting officer placed him in handcuffs; and before informing appellant of his *Miranda* rights, he asked him several times where the gun was located. Eventually, appellant told the police that the gun was in the abandoned house. At trial, appellant sought to suppress his statement regarding the location of the gun because he was not given his *Miranda* warnings. This Court addressed the issue as follows:

> Under these circumstances, the police, in the interest of public safety, could properly act promptly to ascertain the location of the gun without first informing appellant of his *Miranda* rights. Until found, the gun presented a threat not only to appellant's grandchildren, but also to any other children who unwittingly might have come upon the gun after venturing into the abandoned house. Therefore, appellant's responses to police inquiries regarding the gun's location were not subject to suppression and were properly admitted into evidence at trial.

*Bowers*, 583 A.2d at 1171–72.

¶ 23 The concerns for the public safety that the officers confronted in *Quarles* and in *Bowers* were the same concerns of the officers in the instant case. Even though those cases involved motions to suppress statements for lack of *Miranda* warnings, they are instructive in the context of warrantless searches. In fact, the *Quarles* Court suggested that it was extending the exigent-circumstances exception to the warrant requirement in the Fourth Amendment context to the Fifth Amendment *Miranda* warning case. *Quarles*, 467 U.S. at 653 n. 3, 104 S.Ct. 2626. Just like the officers in *Quarles* and in *Bowers*, the officers in the instant case could properly act to locate the gun before it injured the officers or other innocent individuals.

¶ 24 Accordingly, the order granting motion to suppress the evidence is reversed.

¶ 25 JOYCE, J., Filed a Concurring Opinion.

JOYCE, J., concurring:

¶ 1 The majority has determined that the trial court erred in suppressing the evidence based on the exigent circumstances exception to the warrant requirement discussed in *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995). Majority Opinion, *ante* at 716 and 717–20. While I agree with the majority's ultimate result, the facts presented here are distinguishable from those at issue in *White*. As I find *Commonwealth v. Morris*, 537 Pa. 417, 644 A.2d 721 (1994), *cert. denied*, 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994), to be instructive, I would uphold the search and reverse the suppression court's decision on that basis.

¶ 2 *White* involved the warrantless search of an automobile for drugs. Specifically, the police in *White* obtained information from a confidential informant that the defendant and a fellow drug dealer, Henry Bennett, had possession of a large supply of cocaine and were expected to make a sale of drugs on a particular date. *White*, 543 Pa. at 48, 669 A.2d at 898. As a result, the officers conducted a surveillance of both the defendant and Bennett. *Id.* In addition, the police obtained a warrant for the search of Bennett's residence, vehicle and person and for the search of White's person and residence. *Id.* However, the police did not obtain a warrant for White's vehicle. *Id.* Upon observing an unidentified male enter White's vehicle, the police stopped White and took him and his passenger into custody. *Id.*, 543 Pa. at

48–49, 669 A.2d at 898. The police thereafter entered the vehicle and retrieved therefrom a bag containing cocaine as well as a marijuana cigarette that was in plain view on the vehicle's console. *Id.*, 543 Pa. at 49, 669 A.2d at 898. Based on these facts, the Supreme Court concluded that the warrantless search of White's vehicle was improper as the police had time to obtain a warrant and no exigent circumstances existed to justify the search. *Id.*, 543 Pa. at 53, 669 A.2d at 901.

¶ 3 In comparison, *Morris* involved a case in which the police stopped the defendant for a minor traffic violation. *Morris*, 537 Pa. at 419, 644 A.2d at 722. Morris refused to obey the officer's directive to keep his hands on the steering wheel and engaged in furtive movements. *Id.* As a result, the officer ordered Morris to exit the vehicle and conducted a pat-down search. *Id.* While the driver's door was open, the officer observed a two-foot long metal pipe as well as a plastic bag on the front seat. *Id.* The officer opened the bag and discovered that it contained cocaine, marijuana and drug paraphernalia. *Id.* In upholding the search, the Supreme Court stated:

> The search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. [T]he issue is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was in danger.

*Morris*, 537 Pa. at 421, 644 A.2d at 723 (citations and quotation marks omitted). The facts presented here fall squarely within the limited weapons search deemed permissible in *Morris*, as opposed to a vehicle search for contraband of the type at issue in *White*.

¶ 4 The record reflects that at approximately 3:00 a.m., Officer Tyrone Forrest learned that the victim had been shot. N.T. Suppression, 3/9/98, at 131. He verified the shooting as he observed the paralyzed victim, as well as a bullet hole in the victim's car and blood on the passenger seat. *Id.* at 132–133. The officer immediately called for medical assistance and broadcast a description of the suspects over the police radio. N.T. Suppression, 3/9/98, at 131; N.T. Suppression, 3/10/98, at 199.

¶ 5 Shortly after overhearing the broadcast, Officer John Barker observed two individuals, Appellee and his co-defendant, Shawney Perry, who fit the description. N.T. Suppression, 3/10/98, at 201. Officer Barker and other officers stopped the vehicle a few minutes later. *Id.* at 204. Appellee and his companion were then ordered to exit the vehicle and were frisked for weapons. *Id.* at 207–208.

¶ 6 Officer Barker detained the suspects until one of the victims, Javon Jones, was brought to the scene approximately fifteen (15) minutes later. *Id.* at 210. Jones immediately identified Appellee and Perry as the men who had done the shooting. *Id.* at 211. Jones also informed Officer Barker that Appellee and Perry had two guns. *Id.* At this point, Appellee and Perry were arrested. *Id.* The police, who had noted that the floormats of the shooters' vehicle were askew, lifted up the mats on the driver's and passenger's side and recovered a .9 mm Helwan and a .22 caliber Beretta. *Id.* at 212–213. Inspection of the weapons revealed that each contained a round in the chamber and five additional live rounds in the clip. *Id.*

¶ 7 Unlike the circumstances presented in *White*, the above testimony indicated that the police here had no advance opportunity to secure a warrant. More importantly, the officers in this case were not attempting to search the vehicle for drugs or contraband. Rather, based on specific

and articulable facts, the police had reason to believe that Appellee and his companion were armed and presented a danger to the safety of the police or others. N.T. Suppression, 3/10/98, at 257–258, 261, 264 and 266–267. A limited search of the passenger compartment was therefore permissible to prevent the men or others from gaining access to the weapons. *Morris, supra. See also Commonwealth v. White,* 543 Pa. at 56 n. 5, 669 A.2d at 902 n. 5 (noting that nothing in *White* was intended to invalidate warrantless searches where the police must search in order to avoid danger to themselves or others).

¶ 8 While I believe that the search was permissible under *Morris,* I would still find the evidence admissible pursuant to the inevitable discovery or independent source rule. Pursuant to this doctrine, evidence will be deemed admissible where it is established that it would have been inevitably discovered through an independent source. *Commonwealth v. Brundidge,* 533 Pa. 167, 175, 620 A.2d 1115, 1119 (1993).

¶ 9 As applied to the case *sub judice,* there is no doubt that the police would have inevitably discovered the weapons if they had impounded the vehicle and conducted an inventory search. In *White,* however, the Supreme Court determined that evidence was not admissible pursuant to the inevitable discovery doctrine where it was acquired as part of the search of the vehicle rather than an inventory search. *White,* 543 Pa. at 57, 669 A.2d at 903. The inevitable discovery rule was developed because:

> The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse position, that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Brundidge,* 533 Pa. at 175, 620 A.2d at 1119 (citations, emphasis and quotation marks omitted). The effect of *White* is to put the police in a worse position than they would have occupied had no misconduct occurred during the search of a vehicle. There is no functional difference, at least from the perspective of protecting an individual's privacy rights, between an inventory search conducted at a police station or a search of the vehicle on the highway. Accordingly, the inevitable discovery doctrine should not be confined to those situations in which an inventory search was actually conducted. Rather, proper application of the rule would allow admission of the evidence where it can be shown that it would have been inevitably discovered. In this case, there is no doubt that the evidence would have been inevitably uncovered during an inventory search.