BOSSON, Justice (dissenting) {25} With respect, I dissent from the majority’s holding that exigent circumstances justified a warrantless search of the car trunk in this case. I fear that in its holding, the majority risks eroding the underpinnings of our state-constitution jurisprudence. {26} That jurisprudence makes it “well-established that Article II, Section 10 [of the New Mexico Constitution] provides more protection against unreasonable searches and seizures than the Fourth Amendment.” State v. Leyva, 2011-NMSC-009, ¶ 51, 149 N.M. 435, 250 P.3d 861; see also State v. Cardenas-Alvarez, 2001-NMSC-017, ¶ 15, 130 N.M. 386, 25 P.3d 225 (“The extra layer of protection from unreasonable searches and seizures involving automobiles is a distinct characteristic of New Mexico constitutional law.”). And, as the majority correctly states, “New Mexico has consistently expressed a strong preference for warrants.” Maj. op., ¶ 11 (citation and internal quotations omitted). In New Mexico, search warrants are the rule, not the exception, a proposition our appellate courts have repeated time and again over the past twenty years. {27} Assuredly, there are occasional exceptions to the warrant requirement, one of those exceptions being a showing of exigent circumstances, such as evidence of an imminent threat to public safety which compels an immediate search without a warrant. See State v. Gomez, 1997-NMSC-006, ¶ 39, 122 N.M. 777, 932 P.2d 1 (“[W]e announce today that a warrantless search of an automobile and its contents requires a particularized showing of exigent circumstances.”). The determination of exigent circumstances is an objective one that, “[o]n appeal, we may review de novo.” Id. ¶ 40. A warrantless search may be upheld “based ... on the combined presence of (1) probable cause to believe that lawfully seizable items are present, and (2) case-specific exigent circumstances that make it reasonable to conduct the search without first going to a judicial officer and obtaining a search warrant.” State v. Rowell, 2008-NMSC-041, ¶ 26, 144 N.M. 371, 188 P.3d 95 (citations omitted). {28} The district court found probable cause to believe that a rifle might be in the trunk of the car based on (1) the report to police dispatch of a weapon being pointed out of a car window, (2) the car seized matched the description given to dispatch, and (3) the fact that police had not located the weapon in the passenger compartment. Therefore, the warrantless search of the trunk was justified if there were “case-specific exigent circumstances that make it reasonable to conduct the search without first going to a judicial officer and obtaining a search warrant.” See id. {29} The majority opinion correctly points out that judgment is at the heart of the inquiry. Maj. op., ¶ 22. “A warrantless search is invalid if, in the court’s estimation, the officer’s judgment that exigent circumstances existed was not reasonable.” Gomez, 1997-NMSC-006, ¶ 40. The question is, therefore, would an objectively reasonable, well-trained officer make the same judgment that was made here? See id. “Quite simply, if there is no reasonable basis for believing an automobile will be moved or its search will be compromised by delay, then a warrant is required.” Id. ¶ 44. {30} However, for the Court to defer to the good judgment of officers, the officers must have exercised judgment in the first place. Unfortunately, these officers testified that the search of the trunk was based less upon any specific danger and more upon their training and department procedures. As one officer testified, “that’s what we are trained to do in the academy, when doing felony stops.” In other words, these officers were trained to search any automobile trunk during a felony stop, merely to eliminate the possibility that people or weapons might be concealed therein. While no one can fault the prudence of such a procedure, it falls far short of the particularized and case-specific justification that our case law has uniformly required for the past twenty years, since Gomez, to bypass the constitutional safeguard of a warrant. {31} The majority opinion also points to the gathering crowd of young people who, potentially, might have gained access to the car and the concealed rifle. But close analysis belies any true exigency. At the time the trunk was opened, the three suspects were already handcuffed and safely in custody in separate patrol cars. True, there was a crowd of people “across the street” from where the search of the car was being conducted. The K-9 officer testified that the dog — searching the car for any additional occupants — was distracted because the wind carried the scent of the people across the street, “so [the dog] was more interested in checking the people across the street than he was on checking the vehicle.” {32} That was the extent of any “disruption” caused by the crowd.- There was no testimony that the crowd was bearing down on the area controlled by the five officers who had the location safely under control. Nor was there any evidence that the officers intended to relinquish control of the vehicle to any private citizen. {33} In focusing on the presence of others near the scene, the maj ority looks to our recent opinion in Rowell, 2008-NMSC-041, as controlling authority. Maj. op., ¶ 15. Specifically, the majority states that our rationale in Rowell was “that the deadly weapons in the defendant’s car remained accessible to students and others until the officer took prompt steps to secure the weapons,” which, in turn, required a warrantless search of the car and trunk. Id. ¶ 16 (emphasis added). In analogizing this case to Rowell, the majority focuses on some similarities. In both cases,.the suspects were in custody and no longer had access to the weapons located in the car, but it was nonetheless possible, at least theoretically, for other people to gain access to the weapons. Maj. op., ¶¶ 17-18. {34} I agree with the majority that in the case before us probable cause existed to believe that a gun might be concealed in the trunk. I also agree that it is reasonable to assume that any gun might be loaded, and therefore, potentially dangerous. But I depart from the majority’s holding that it was reasonable to “believe that a gun used in the commission of a crime was in a vehicle accessible to a group of people, even if it was not accessible to the Child.” Id. ¶ 19. Unlike Rowell, there was little discussion in the district court about any purported threat posed by a crowd of young people positioned at all times “across the street.” If the officers on the scene were so little concerned, why should this Court essentially create a concern, and from there find exigent circumstance? {35} Additionally, no testimony suggested that the search was conducted “to inventory [the vehicle’s] contents in anticipation of having it towed and impounded.” See Rowell, 2008-NMSC-041, ¶ 3 (observing the officer searched the vehicle after securing the defendant in the patrol car, anticipating impounding the vehicle). Nor in this case does it appear that the officers were going to release the vehicle into the custody of another person. See id. ¶ 4 (“After the officer learned that no tow truck was available, he contacted Defendant’s mother and arranged for her to take custody of her son’s car.”) When Child’s grandfather arrived at the scene and requested to take the car home, one of the officers testified that he replied, “No, that car belonged to us now. It was used in a crime.” Ostensibly, the officers intended to impound the vehicle, but the State did not produce the evidence necessary to establish a valid inventory search, and the district court correctly made no such finding. {36} The Rowell analysis relies to a significant extent on the observation in that case that “[bringing a shotgun or other deadly weapon onto school grounds poses such a high risk of danger that the Legislature specifically has made it a felony offense. See [NMSA 1978,] § 30-7-2.1 [(1994)].” Rowell, 2008-NMSC-041, ¶ 33. As such, because it was “not unreasonable for the Legislature to conclude that the presence of dangerous weapons on school property is an intolerable threat to the safety of students and teachers,” it was therefore, not unreasonable for the officer to take the necessary precautions “to remove the weapons from the car and the school grounds.” Id. Implicit in Rowell is the rationalization that, until the officer did so, “the deadly contents of Defendant’s car remained accessible to students and others.” Id. ¶ 34. But not so in the case before us. {37} In this case, I do not agree that Rowell is on point. The incident in question did not occur on school grounds or anything like it. That portion ofths Rowell analysis that deals with the Legislature’s concern for the “intolerable threat to student and teacher safety,” is not analogous here. In this case, there is no corresponding law that demonstrates an inherent, intolerable threat to public safety in transporting a rifle in an automobile trunk, itself a lawful act. As such, the presence of the rifle in the locked trunk is not an “intolerable threat” to public safety that, by itself, would justify an immediate search without waiting for ordinary process to prodirce a warrant. Rowell’s warrantless search being predicated upon the exigency of a peculiar set of circumstances — school grounds and the presence of students — cannot be understated. Its reach should be limited to the particular circumstances, and the threat posed, that are simply absent from this case. {38} Without going too deeply into the facts, it bears emphasis that five officers were present on the scene, the crowd was across the street, and there was no testimony that the area was not secure or that the officers were going to leave the vehicle accessible to the public. Additionally, no testimony established that the alleged weapon was cocked, fragile, or, like a bomb, could potentially go off at any moment. {39} The majority offers an additional rationale to justify the warrantless search — that the location of the weapon used in the commission of the crime was as yet unknown, and therefore, officers were required to act swiftly to secure the weapon and protect the public. Maj. op., ¶¶ 20-21. The concern was that the rifle might not have been in the trunk, and, if not, that it would have been elsewhere, posing a risk to the public. Therefore, the exigency exists because the police needed to search the trunk, and without delay, as much to ascertain that the gun was not there as to find that it was. As support, basing the exigency in part on the inability of police to locate a known or reported weapon, the majority cites to two intermediate appellate court opinions: Pennsylvania, Commonwealth v. Stewart, 740 A.2d 712, 718 (Pa. Super. 1992), and New Jersey, State v. Jones, 20013 WL 560837 (N.J. Super. A.D. 2013) (unreported). See maj. op., ¶¶ 20-21. {40} In Stewart, police stopped a car and testimony established probable cause to believe that the occupants were involved in a shooting, but when police patted the subjects down, the guns were not located on their person. Stewart, 740 A.2d at 718. The concern then was that the guns might have been tossed out of the car window, if not located in the car. Thus, as the majority noted, the police were concerned that a third person might come across the gun, and to prevent that, the police needed to act immediately. See id.; see also maj. op., ¶ 20. However, that was not the only evidence offered as proof of exigency. Additional testimony established that: (1) to search the route the vehicle traveled would have exhausted police resources at that time of night, (2) it would have taken several hours “to obtain a search warrant at approximately 3:00 a.m. on a Saturday morning,” (3) it would have “taken [police] several hours to get a tow truck at that time of night,” (4) area night clubs were getting out at the time of the incident which was a concern to the officers, and (5) the gun in question was more “fragile” or prone to “go off’ than other types of guns. Stewart, 740 A.2d at 716. {41} None of this is present here. Although in this case there could have been a reasonable concern that the rifle had been deposited somewhere else before the officers arrived at the scene, no evidence established that police resources were taxed at that point, that it would have taken an excessive amount of time to get a warrant to search the trunk, that there was anything uniquely fragile about the rifle, or that the area to be searched was difficult or unusual. In fact, the vehicle was stopped in sight ofwhere the reported incident took place, shortly after the report. Also, no evidence established how long it would have taken to secure a warrant. {42} Also, in Stewart, the court observed that the search was minimally intrusive — an officer “shined a flashlight [through the car window] and noticed that the floor mat in front of the driver’s seat was askew. He lifted the mat and discovered a loaded 9-mm gun under the driver’s side floor mat and a .22 caliber Beretta under the passenger side floor mat.” Stewart, 740 A.2d at 718. The court concluded that the search was not unreasonable, but in so doing, it “balancfed] the gravity of the offense and the level of danger confronted by the officers against the level of intrusion.” Id. at 719. W ould the court have concluded that it was permissible to search the trunk as well? Perhaps, but it is not clear from the opinion. While the search in Stewart is not a plain-view exception, it is a more minimal intrusion than opening a locked compartment of a car. {43} In Jones, like Stewart, an officer “placed her flashlight next to the open [vehicle] window and observed two inches of a gun handle sticking out from underneath the passenger’s seat. [An officer] opened the door of the [unlocked] car, retrieved the gun, closed the window, and locked the doors.” Jones, 2013 WL 560837 at 2. Officers in Jones had responded to a “shots fired” call in a “high-crime area.” Id. at 1. When officers arrived “they observed a ‘very loud and disorderly’ group of approximately forty to fifty people . . . [and] two males sitting inside [a car near the location of the shots fired call who] seemed nervous” and were acting suspiciously. Id. The two males exited the car, then the defendant “peeked his head inside” the car’s passenger window. Id. When officers approached, the defendant initially denied any knowledge of the vehicle, but later admitted he had been sitting inside. Id. {44} Jones concluded that the search was justified under the plain-view exception; the seizure of the weapon was justified by exigency. Id. at 4-5. The court held that the seizure was justified (1) where officers responded to a shots-fired call in a ‘“high-crime area’ known to the officers for gun use and homicides,” (2) the “scene was chaotic,” (3) a number of the forty to fifty disorderly people were in the vicinity of an unsecured gun “in an unlocked car with the passenger window open,” and (4) the defendant was not in custody. Id. at 5. Jones further stated, “[i]n sum, the observation of the gun was made without any search and the police intrusion to seize the gun was limited to what was necessary to secure the weapon.” Id. Actually, I find the Jones analysis persuasive under the circiimstances, but our case simply is not Jones. {45} Unlike Jones, we have a secured scene, in a place that was not described as a high crime area, and the suspects were safely in custody. The only things the officers were doing at that point were (1) following department “felony-stop procedures” and (2) gathering and processing evidence. While public safety is a reasonable and valid concern, neither the officers nor the State expressed a public-safety concern as a rationale for exigency. {46} I agree that courts should defer to an officer’s good judgment, but in this case the officers never offered evidence of any exercise of judgment. The officers simply followed protocol. If officer protocol is now enough to establish a valid exigency, then I fear we have lost all control over automobile searches. As the district court judge observed, “I’m not questioning the procedures undertaken by law enforcement... that it wouldn’t perhaps have been advisable to check the trunk out. But I’ve got to divorce myself from what may be smart from a protective standpoint from what’s covered by [Article II, Section 10 of the New Mexico Constitution].” {47} At bottom, I write this dissent because I fear how the majority opinion will be applied in the arena of criminal prosecutions. I fear that our holding today brings us closer to the federal automobile exception, assiduously avoided by this very Court in Gomez, that “permits a warrantless search of a lawfully stopped automobile and any closed containers within that automobile,” almost as a per se exigency based on the presence of an automobile. Gomez, 1997-NMSC-006, ¶ 34. {48} We live in a dangerous world, replete with violence and the criminal abuse of firearms. It will not require much of a stretch for the prosecution to frame a reasonable apprehension of firearms in the case of many, if not most, felony stops. Before today, I had thought that closed (and particularly locked) containers or compartments within automobiles could not be searched for a weapon without a warrant. I had thought that exigent circumstances would be limited to the suspected presence of something like explosives, or a missing kidnap victim, or a felon on the loose, or an immediate definable threat to the safety of school children. I remain hopeful that I am wrong about the potential impact of the majority opinion. But my concerns compel this dissent in the hope that future events prove me wrong. RICHARD C. BOSSON, Justice